MARION E. SEAVER, Respondent, v. MATT C. RANSOM and FRED F. FISK, as Executors, etc., of SAMUEL A. BEMAN, Deceased, Appellants.

Third Department, December 28, 1917.

**Decedent's estate — contract — promise by husband to wife to leave property by will for benefit of niece — right of niece to enforce said promise — evidence of sisters of testatrix as to her statements as to disposition of her property.**

Where a wife, intending to leave property to her niece, who was the object of her principal love, affection and solicitude and who had a moral claim both upon her and her husband, told her husband, who was a lawyer familiar with estates and who had drawn the will, that it did not express her intention, but fearing that she would not live long enough for him to prepare another instrument she signed the one prepared, upon his promise to leave enough in his will to care for the niece, and he failed to do so, the niece is entitled to maintain an action against the executors of the husband to enforce his agreement, under the principle expressed in *Lawrence* v. *Fox* (20 N. Y. 268).

In was error to exclude, upon the defendants' objection, the evidence of the sisters of the testatrix as to her statements shortly before the will as to how she would dispose of her property.

LYON and COCHRANE, JJ., dissented.

APPEAL by the defendants, Matt C. Ransom and another, as executors, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Franklin on the 21st day of July, 1917, upon the decision

of the court after a trial before the court without a jury, with notice of an intention to bring up for review the decision of the court, the order overruling the demurrer and the interlocutory judgment based thereon.

*Bryant & Lawrence [Frederick H. Bryant* of counsel], for the appellants.

*Kellas & Kellas [John P. Kellas* of counsel], for the respondent.

KELLOGG, P. J.:

Judge Beman and his wife, at the time we are interested in them, were of the ages of seventy-three and sixty-seven respectively. They never had any children. They resided at Malone, in a house belonging to her, which they valued at $10,000 but which was worth only $6,000. She also owned a little other property of the value of from $1,000 to $2,000. The trial court did not permit it to appear what his property was worth, but it was conceded that the value was more than the plaintiff's claim. He was a lawyer, and for many years had been the county judge and surrogate of Franklin county, and was familiar with the law of estates. She had two sisters, Mrs. Seaver and Mrs. Hardy, and apparently had good relations with them. She told them shortly before her death that she was about to make a will and in what manner she would dispose of her property, which apparently was satisfactory to them. Mrs. Seaver had a daughter, the plaintiff, who was without means, and was then about thirty-four years of age and in ill-health. Mrs. Hardy had a son. When the plaintiff was about sixteen years of age her father and mother removed to Albany, and from that time, for more than half of the time, the plaintiff was a member of the Beman household, was treated as a member of the family and apparently occupied in the family the position of daughter more than that of niece. A room in the Beman house was furnished with her furniture, occupied by her and was always known as " Marion's room." Mrs. Beman was upon her death bed and the plaintiff hastened home and ministered to her.

Mrs. Beman, realizing that she had but a few hours to

live, made her will. It was drawn by her husband, witnessed by her physician and nurse, and in about an hour thereafter she became unconscious and died the next day without regaining consciousness.

In considering this case we must remember that if she had died intestate, her real estate, including the house, the great bulk of her property, would have been gone to her sisters, Mrs. Seaver and Mrs. Hardy, with the result that the plaintiff would, in substance, have had the benefit of one-half of it. From the facts stated it would not be unreasonable that she would give the use of the house to her husband during his life and the remainder of her property to the plaintiff. It would be unreasonable to disinherit her sisters and make no substantial provision for her niece and foster daughter. The will, in substance, provided as follows: Gave to the plaintiff $1,000, to Mrs. Hardy and her son $100 each, to Mrs. Seaver $500, and then provided that if her real property, aside from the house, was more than sufficient to pay the legacies, any balance of it was to go to the plaintiff. The husband was given the use of the house during his life and upon his death it was given to the American Society for the Prevention of Cruelty to Animals of the City of New York, the rents and profits to be used for the prevention of cruelty to animals in Franklin county by the officers of said society, by and with the assistance and direction of the officers of the Franklin County Society for the Prevention of Cruelty to Animals. The husband was made the residuary legatee and devisee and executor.

It does not appear that a dog, a cat, a bird or any animal at any time had a home in the Beman house, or that she ever showed any particular interest in animals. Unexplained, we cannot understand why she should disinherit her sisters and practically overlook her favorite niece, who for many years had been treated by her and her husband as their daughter, and throw her property to the dogs. Aside from the evidence of the physician and nurse, hereafter mentioned, no reasonable explanation can, under the circumstances, be made of such a will. It is not consistent with her character as a woman, her method of life, the treatment always accorded to the plaintiff and the affection and love she manifestly

bore her. If an explanation consistent with the natural desires and affection of the testatrix, and with the facts surrounding her, is presented, and which brings about a just result, it should be welcomed. The explanation shown by the evidence is consistent with the natural sentiment and desire of the testatrix and demonstrates her continued love and affection for her favorite niece, and shows that she not only realized what she was doing, but did what the ordinary person would do under her circumstances.

Shortly before the will was executed, in the presence of her physician, she told her husband that she desired to make her will, and he offered to draw it. He proposed to go some distance to his office to get blanks; the weather was inclement and he ·was feeble and the doctor suggested that he had some blanks at his office and he went for them. While he was gone the husband received instructions from the wife as to the will. The doctor returned, the husband drew the will and read it to the wife in the presence of the doctor. We quote from the doctor's testimony: " At the time that he read the will I was there, yes. And she said that is not as I want it; I want to leave Marion Seaver this house; I want to leave her this house, or its equivalent because she is in broken health and I don't want her to have to work for a living. And Judge Beman said, I can tear this will up and write another as I have another blank. And she said, I am afraid my strength won't hold out long enough so that I will be able to sign it if you do. Then the Judge asked her what she objected to in the will and she told him that it was on account of not leaving Marion Seaver enough. And the Judge says, if you will sign this will I will arrange, I will leave enough in my will to make up the difference. And after some conversation she signed the will. * * * Q. What did she say then to him? A. She asked him whether he would promise; she said, ' Albert, will [you] agree to do as you promised about this.' And he said, ' I will, Nettie.' I remember that very distinctly because I sat — * * * Q. Go on, doctor, what next was said? A. We brought her a lap board. Q. He said he promised her he would? A. He said, ' I will, Nettie,' and he held up his right hand the same as though

Third Department, December, 1917. [Vol. 180.

he was taking an oath at the time that he said it. Then we brought the lap board and she was not able to see the will. I steadied her hand and she signed it. She asked Miss Van Ornum, the nurse, and I to act as witnesses, and she told us that it was her last will and testament. Q. And she signed it there? A. And she signed it and I held her hand when she signed it. Q. Did you hear something said between them also as to what they considered the value of the house? A. Why, they considered the house to be — Mr. Bryant: I object. The Court to Witness: Q. What did they say about that, if anything? A. $10,000 was the price. Mr. Kellas to Witness: Q. At that time? A. At that time. Q. What did you hear said between them as to what they considered the value of the house? A. $10,000 was the price that they talked."

The doctor is apparently a disinterested, creditable witness. He tells a reasonable story and the circumstances corroborate his evidence and welcome his explanation of what otherwise would be a strange, unnatural act on the part of the testatrix. The nurse, while the doctor and husband were present, was in and out of the room attending to various duties and cannot relate the conversation, although she heard parts of it. She heard them talking about a will; remembers distinctly her witnessing a will; when the will was read she knew that Mrs. Beman was dissatisfied with it, but cannot state her language. There is nothing that reflects upon the integrity or fairness of this witness; she was apparently entirely disinterested. The facts are satisfactorily proved and make the only reasonable explanation which can be thought of for an act which otherwise would be beyond comprehension. Judge Beman's will made no provision for the plaintiff.

The trial judge, who was more or less in touch with the local situation, who was in the atmosphere of the trial and saw and heard the witnesses, believed them, and there is no reason why we should disbelieve them.

It is not necessary to discuss the question which has been elaborately argued as to whether the plaintiff can recover upon the theory of a trust relation assumed by Judge Beman towards plaintiff. The judgment can stand upon the promise

made to the wife, upon a valid consideration, for the sole benefit of the plaintiff.

The husband and wife were not making a contract for their own benefit, but the sole object of entering into it was to benefit the plaintiff. Aside from the plaintiff the contract would not have been made; she was the only reason for it. In that respect this case differs from other cases in the books where a party incidentally finds a provision in a contract which he thinks makes to his advantage and seeks to recover upon it, when the parties did not in fact have him in mind. The testatrix was to get no possible benefit from the contract and, as both understood, would not be living when the time for enforcing it arrived.

Unlike many of the cases, if there is otherwise a technical objection to the enforcement of this contract, it having been made on the part of Mrs. Beman solely for the benefit and in the interest of the plaintiff, the plaintiff may treat her as her agent, and by bringing the action ratify her act.

In *Lawrence* v. *Fox* (20 N. Y. 268) " A " loaned money to the defendant upon his promise to pay it to the plaintiff to whom " A " stated he owed a like amount, but there was no evidence of any such indebtedness. The plaintiff recovered, two of the judges placing the decision upon the ground that the promise might be treated as made to the plaintiff through the medium of an agent whose act he had ratified. Two judges dissented.

In *Garnsey* v. *Rogers* (47 N. Y. 233) the court says, at page 240, that it does not understand that the case of *Lawrence* v. *Fox* " has gone so far as to hold that every promise made by one person to another, from the performance of which a third would derive a benefit, gives a right of action to such third party, he being privy neither to the contract or the consideration. To entitle him to an action, the contract must have been made for his benefit. He must be the party intended to be benefited."

In *Vrooman* v. *Turner* (69 N. Y. 280) an owner of property subject to a mortgage on which he was not liable, conveyed it. The conveyance recited that it was subject to a mortgage " which mortgage the party hereto of the second part hereby covenants and agrees to pay off and discharge, the

same forming part of the consideration thereof," and the court considered that that clause was inserted for the benefit of the grantor and for the purpose of protecting himself, and that there was nothing to indicate that he was obtaining this promise or that the other party made it for the benefit of the mortgagee, and did not for that reason permit a recovery. Much was said in that case which, in view of the later cases, need not now be considered. We need not go back and discuss the old cases because the doctrine of *Lawrence* v. *Fox* is progressive, not retrograde. The course of the late decisions is to enlarge, not to limit the effect of that case.

A similar question was before us in *Rigney* v. *N. Y. C. & H. R. R. R. Co.* (161 App. Div. 188; affd., 217 N. Y. 31). In that case the city of Rensselaer authorized the railroad company to change a grade in a street upon which the plaintiff's premises abutted. It was conceded that no liability existed against the city in favor of the abutting owner on account of the mere change of grade permitted by the city. However, the company, as a condition of the permission to change the grade, agreed that it would pay and liquidate any damage resulting to any person or property from the work done, "including damage resulting from change of grade of street, being approaches to said bridge." The plaintiff having been injured by the changed grade, recovered against the defendant therefor. *Lawrence* v. *Fox* was urged against the recovery, but the Court of Appeals held that the true rule of *Lawrence* v. *Fox* required that there must be an intent by the contract to secure some benefit to the plaintiff, which was apparent, and as a second element of the recovery, that there should be some obligation or duty owing 'from the municipality to the plaintiff. It says: " It exists in the fact that the city is under some obligation to protect its inhabitants, and when it enters into a contract for public work, which may result in damage to one of such inhabitants, for which otherwise he would be without remedy, the municipality may require the contractor to compensate the person injured," citing *Pond* v. *New Rochelle Water Co.* (183 N. Y. 330, 338) and *Smyth* v. *City of New York* (203 id. 106, 115).

In the *Smyth* case dynamite was used in building the sub-

way in Park avenue, New York, and quantities of dynamite were stored in the vicinity for that purpose, with the result that an explosion caused an injury to the Murray Hill Hotel, which abutted the avenue. The action was brought against the city and McDonald, who contracted with the city for the construction of the subway, and against others, but the subcontractor was not a party. It was held that the city was not liable on the ground of negligence or nuisance, or otherwise, and that the complaint was properly dismissed as to it, and it was assumed that for the same reason McDonald, the principal contractor, would not be held for negligence of the independent subcontractor. But he, as a condition of the contract, had agreed with the rapid transit commission, in behalf of the city, that he would be liable for damage done to an abutting owner by the method in which the construction should be done, and it was held that by virtue of said contract he was liable to the plaintiff for the damages which he as an abutting owner had sustained. The court says (at p. 116): "Therefore, though the city might not be liable for injuries occasioned by such negligence, it was entirely proper, if not morally obligatory upon the part of the rapid transit commissioners to secure the abutting owners from loss or damage occasioned by negligence and improper conduct of the work."

In the *Smyth* case the court quotes with approval the following from the opinion in the *Pond* case: "In the case before us we have a municipality entering into a contract for the benefit of its inhabitants, the object being to supply them with pure and wholesome water at reasonable rates. While there is not presented a domestic relation like that of father and child or husband and wife, yet it cannot be said that this contract was made for the benefit of a stranger. In the case before us the municipality sought to protect its inhabitants, who were at the time of the execution of the contract consumers of water, and those who might thereafter become so, from extortion by a corporation having granted to it a valuable franchise extending over a long period of time. (See, also, *Rochester Telephone Co.* v. *Ross*, 195 N. Y. 429.)"

We conclude, therefore, that in order to have the benefit of such a contract it should appear from the contract that it was made for the benefit of the plaintiff and that there must be

some equitable or moral duty from the contractee to the plaintiff.

Here the husband, a lawyer, caused his wife to execute a will which disposed of her property directly contrary to her wishes and deprived the plaintiff, her niece and foster daughter, the object of her principal love, affection and solicitude, of the substantial benefits intended for her. She was a member of the judge's family, was treated by them substantially as a daughter, and each of them owed her a duty of providing for her rather than the New York City Society for the Prevention of Cruelty to Animals, in which she apparently had no particular interest. The plaintiff had a moral claim, both upon the husband and the wife, and when the husband sought to divert the wife's property from her, against the wife's wishes, plaintiff was not such a stranger to the contract that he can escape his obligations under it.

The state of the testatrix's mind with reference to her will and to the plaintiff are important considerations, and bear directly upon the probability of the evidence of the doctor and nurse. *Prima facie* her intentions are to be gathered from the will, but the plaintiff's theory is that the will as made was not the real will of the testatrix's mind but is the result solely of the agreement. I think it was error to exclude, upon the defendants' objection, the evidence of the testatrix's sisters as to her statements shortly before the will as to how she would dispose of her property. We may assume that having offered the evidence it probably would have been favorable to the plaintiff. At least the offer and the ruling disarmed the defendants in a way from claiming that the real state of the testatrix's mind is not sufficiently shown by the evidence of the doctor and the nurse. If the will was contrary to the testatrix's firm intentions, the evidence of the doctor and the nurse are the only possible explanation of her making such a will.

The judge was a legal adviser as well as the husband of the testatrix. He owed a duty to her and he owed a duty to the plaintiff when he was informed by his wife that she intended to devise the house to the plaintiff. The court will not allow its officer to commit such a fraud upon the plaintiff as would result, if relief were denied her here. It is better not to draw close legal distinctions but to say that on the facts the

law will get at an attorney who seeks to avoid such a contract, and will compel performance.

It is profitable to again refer to the opinion in *Lawrence* v. *Fox*, which closes as follows: " No one can doubt that he owes the sum of money demanded of him, or that in accordance with his promise it was his duty to have paid it to the plaintiff; nor can it be doubted that whatever may be the diversity of opinion elsewhere, the adjudications in this State, from a very early period, approved by experience, have established the defendant's liability; if, therefore, it could be shown that a more strict and technically accurate application of the rules applied, would lead to a different result (which I by no means concede), the effort should not be made in the face of manifest justice."    I favor an affirmance.

All concurred, except Lyon and Cochrane, JJ., dissenting.

Judgment affirmed, with costs.