[Civ. No. 26755. Second Dist., Div. One. Aug. 5, 1963.]

MAIER BREWING COMPANY, Plaintiff and Respondent, v. PACIFIC NATIONAL FIRE INSURANCE COMPANY, Defendant and Appellant.

Herbert Z. Ehrmann, William L. Stein and Long & Levit for Defendant and Appellant.

Betts & Loomis and John A. Loomis for Plaintiff and Respondent.

LILLIE, J.—Defendant appeals from a final judgment decreeing reformation of a fire insurance policy issued to plaintiff, and further decreeing that plaintiff recover from defendant certain sums representing the loss sustained by the subject fire plus interest from July 26, 1957 (the date on which defendant formally denied liability under the policy). The amount of loss was determined by the trial court at a hearing subsequent to the entry of the interlocutory judgment, which ordered reformation of the policy, and upon remand by this court following dismissal of defendant's attempted appeal from such interlocutory judgment. (194 Cal.App.2d 494 [15 Cal.Rptr. 177].) Despite the dismissal of the prior appeal, and the parties having so stipulated, we have also undertaken to consider the several points therein briefed and argued which are adopted in the present proceeding by reference; they relate, of course, to the issue whether the evidence justified a reformation of the policy in the first instance.

The background facts are summarized in the opinion on the prior appeal. (194 Cal.App.2d 494, 495 [15 Cal.Rptr. 177]): "Maier owned and operated a brewery in Los Angeles. The buildings and equipment were insured against loss by fire by two policies issued by Home Fire and Marine Insurance Company, one effective December 8, 1952, to December 8, 1955, and the other effective January 22, 1953, to January 22, 1956, and a third policy issued by Union Insurance Society effective January 13, 1953, to January 13, 1956. Maier's property included a large lot known as the Gas Company property on which it stored equipment of the value of $318,000. The Home policies covered the equipment on the Gas Company property.

"About October 19, 1955, Pacific National, through Behrendt-Levy Insurance Agency, issued to Maier a fire insurance policy effective for a term of five years from December 8, 1955, to replace the Home and Union Policies. As the coverage under the Home and Union Policies did not expire on the same date, endorsements were included on the Pacific National policy increasing the coverage afforded to replace the coverage of the old policies as they expired. The Pacific National policy, as written, did not cover the equipment on the Gas Company property.

"About June 30, 1957, a fire occurred on the Gas Company property, damaging and destroying some of the equipment located thereon. Maier, without delay, gave notice of the loss to Pacific National. On July 26, 1957, Pacific National denied liability and gave as its reason that the property damaged and destroyed by the fire was not insured by the policy it had issued to Maier.

"Maier then instituted this suit for reformation of the Pacific National policy 'to add to the description of the premises covered by said policy "former Gas Company property near Macy Street," or such other description as the court may deem proper.' "

The trial court reformed the policy as prayed for by plaintiff. It found that plaintiff and defendant (through its agent Behrendt-Levy) intended and agreed that the former Gas Company property was also covered by the policy; that the personal property damaged and destroyed was located on said property; and that, by reason of the parties' mutual mistake, a specific description of the area in question was inadvertently omitted from the contract of insurance. (The judgment, as was proper, provided for the payment of additional premiums by plaintiff to compensate for the additional coverage decreed.)

Defendant advances two grounds for reversal.[1] It challenges the sufficiency of the evidence and findings to support the determination that the contract be reformed; it also contends that certain evidence supporting such determination, and timely objected to, should not have been admitted. A second specification of error relates to the award of interest by the trial court at the further hearing to fix the amount of plaintiff's loss. We have concluded that none of these claims is sustainable and that the judgment should be affirmed.

Section 3399 of the Civil Code provides that reformation may be had "[w]hen, through fraud or a *mutual mistake of the parties,* or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties. . . ." (Italics added.) The evidence discloses that in late 1954, or in the early part of 1955, Maier's insurance business was solicited by Mr. De La

---

[1]Another specification of error urged on the prior appeal, to wit, the failure to find on the material issue of plaintiff's negligence, has been abandoned in view of the making of such finding at the hearing which followed the dismissal of said appeal.

Soto of the Behrendt-Levy firm; his meetings were with Mr. Alef, Maier's representative. Subsequently, Alef turned the three expiring policies over to De La Soto in three separate envelopes; he also testified that before their delivery to De La Soto, the envelopes contained the endorsements with the description of the Gas Company property thereon.[2] According to Alef, he told De La Soto that he wanted the coverage "to be broad as or broader" than the expiring policies provided for. De La Soto corroborated this statement. He further testified that he then delivered the policies to Mr. Barsaloux, a fire insurance specialist employed by Behrendt-Levy, stating to Barsaloux: "Here are the policies from Maier Brewing Company, do as good a job as you can, David, I want to see if we can improve the coverage."[3] On October 29, 1955, De La Soto mailed Alef a policy of insurance written by defendant; the letter of transmittal read as follows: "We are happy to enclose the captioned insurance policy covering all property at various locations as listed therein. While the policy has been written in the amount of $75,000, it has been increased by endorsements to a total amount of $1,080,000, thereby picking up coverage as it expires on existing policies." Although it does not appear to be disputed that the policy called for a payment of a premium based upon the same valuation as did the previous policies, defendant's contract made no reference to the area where the fire subsequently occurred. The above evidence, in substance, is plaintiff's case for reformation.

Defendant, on the other hand, contends that any agreement between the parties could properly be reformed only if there had first been a meeting of the minds on the properties to be insured; stated otherwise, for a valid contract to exist the consent of the parties must be free, mutual and communicated by each to the other, and consent is not mutual unless all parties agree upon the same thing in the same sense. (Civ. Code, §§ 1565, 1580.) In this connection it has been said that courts are not interested in the subjective

---

[2] Alef further testified that when the three envelopes were returned to him (after use in connection with the issuance of the new policy), he put them back in the file and did not look at them until after the fire; at that time the policies, with the Gas Company property endorsements, were in their respective envelopes.

[3] Barsaloux, De La Soto and another employee of Behrendt-Levy testified, over objection, that it was their intention that defendant's policy should pick up all existing coverage.

intent of the parties, but only in their objective intent—that is, what would a reasonable man believe from the outward manifestations of consent. (*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128 [48 P.2d 13].) Defendant points to certain testimony that plaintiff never advised Behrendt-Levy prior to the fire that it had equipment stored on the Gas Company property or that it wanted coverage of that area; reference is also made to testimony that neither defendant nor any of its agents had any knowledge (or should have known) that plaintiff owned the subject property or used it for storage purposes—the property, it appears, was located some 800 feet from the nearest Maier building. Significantly enough, however, defendant concedes that there was some evidence, although "weak and conflicting," tending to show that Maier brought its ownership of the Gas Company property to the attention of Behrendt-Levy when the envelopes containing the pertinent endorsements were turned over to De La Soto in the fall of 1955. Although it is well settled that the quantum of evidence is for the trier of fact, defendant also contends that the above adverse testimony is not of the "clear and convincing" character necessary to establish plaintiff's right to reformation. But even if the endorsements were in the envelopes, says defendant, they were not seen by Behrendt-Levy prior to the fire, and accordingly neither defendant or any of its agents had the property in mind prior to the fire "and there could not have been a 'meeting of the minds' with respect thereto." This conclusion, however, can only be reached if the trier of fact accorded more weight to defendant's evidence—which obviously was not done.

█ Notwithstanding defendant's extensive critique, we are of the view that plaintiff has brought itself within the principle of law codified by section 3399, Civil Code, that under specified conditions a written contract which does not truly express "the intention of the parties" may be revised so as to set forth "that intention." As pointed out in *Bailard* v. *Marden*, 36 Cal.2d 703, 708 [227 P.2d 10], this language refers to "a single intention which is entertained by both parties." Measured by the objective standard mentioned earlier, the basic question at bar is whether there is any substantial evidence to support the determination below that both parties mutually intended that the Gas Company property be covered by defendant's policy. █ Defendant, unquestionably, is arguing that the Alef-De La Soto meetings were

simply in the nature of preliminary negotiations; apropos, therefore, is comment (a) to section 25 of the Restatement of Contracts (approved in California): "It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain *to induce the other party to the intended transaction to make the definite offer*, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used in opening the negotiations must be considered, as well as the usages of business, and indeed all accompanying circumstances." If the facts of the case were limited to these preliminary meetings there might be some merit in defendant's position. But these are not all of the facts. All of the surrounding circumstances must be considered. When De La Soto handed the existing policies to Barsaloux, he stated: "I want to see if we can *improve* the coverage." Reasonably interpreted this statement clearly implies the absence of an intent to defer the formation of a contract finalizing the single intention theretofore entertained by both parties. Too, this was followed by De La Soto's letter of transmittal wherein reference is made to defendant's contract "picking up coverage as it expires on the existing policies."

Then there is Alef's testimony that the prior endorsements (covering the Gas Company property) were in the envelopes handed to De La Soto. Despite asserted contradictions, it was the trial court's province to consider them in such manner as it deemed proper; the testimony in question, unless obviously false or inherently improbable (which it is not), is accordingly not subject to review on appeal. The prior endorsements contained the following language: "It is understood and agreed that this policy is extended to cover equipment while located under tarpaulins at *the stable yard* located at Commercial and Daly Streets and that other equipment is located on the Gas Company property now owned by the Maier Brewing Company near Macy Street, Los Angeles, Calif." (Italics added.) Of interest is the fact that when defendant's policy was issued, reference was therein made to the "stable yard" location but not to the Gas Company property. Plaintiff properly contends that the latter area was omitted by inadvertence, and the trial court expressly so found,

Finally, there is the testimony of the parties' agents with respect to the intentions mutually entertained. As noted earlier, defendant challenges the admissibility of its agents' testimony in this regard; as will subsequently be pointed out, however, such claims are without merit.

■ As a further ground for the proposition that the judgment is lacking in evidentiary support, defendant contends that plaintiff was guilty of negligence as a matter of law. Reference is made to testimony that Maier failed to show or mention the Gas Company property to Behrendt-Levy at the time the premises were physically inspected prior to the issuance of the new policy; that Maier signed and verified an "application for average rate and statement of values" for rating purposes wherein no mention was made of the Gas Company property; that Maier failed to physically attach the prior endorsements (covering the property in question) to the existing policies and failed to read or examine the new policy until some time after the fire which occurred 18 months later. Defendant cites *Taff* v. *Atlas Assur. Co.*, 58 Cal.App.2d 696 [137 P.2d 483], which declares that the policy holder must offer some explanation or excuse for his failure to read his policy and further declares that the greater plaintiff's experience and intelligence, the more convincing must be his excuse or explanation. But the cited case also holds, as defendant itself has noted, that the trial court must determine under all circumstances whether the policy holder has exercised the ordinary care which the law requires. This is the situation at bar, and the trial court made a determination adverse to defendant's contentions. Without going into a detailed discussion thereof, there was testimony tending to negative the several claims of negligence on plaintiff's part; indeed, if the endorsements (as we must assume) were turned over to defendant's agent, the latter might have exercised a greater degree of care in checking the full extent of Maier's holdings.

■ As for the point that plaintiff failed to read its policy, "The rule is settled in this state 'that the mere failure to read an insurance policy does not militate against its reformation upon the ground of mutual mistake.' [Citation.]" (*National Auto. & Cas. Ins. Co.* v. *Industrial Acc. Com.*, 34 Cal. 2d 20, 26 [206 P.2d 841].)

As its next ground of appeal, defendant contends that statements made by Behrendt-Levy personnel after the fire were erroneously received because (1) they were not within the scope of the agents' authority and (2) they were merely con-

clusions and opinions made long after the transaction in question and therefore not part of the res gestae. The record discloses that De La Soto, Barsaloux and one McAllister all testified that it was their understanding and intention that defendant's policy should pick up all existing coverage. Such testimony was not received upon the theory that the personnel in question had any authority to adjust the loss; rather, it was received to establish the parties' intentions as to what the policy covered. Section 3401 of the Civil Code provides: "In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be." Although defendant has assembled an impressive array of authorities (mostly from other jurisdictions) which are not peculiarly pertinent to the problem, we are of the view that there is no escape from the reasoning and result reached in two California cases which interpret the statutes upon which plaintiff is relying. In *Roush* v. *Kirkham*, 42 Cal.App. 115, 118 [183 P. 353], the court said: " 'In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be.' (Civ. Code, § 3401.) Evidence of the purpose of the agreement, and of the negotiations leading up to its execution, is admissible for the purpose of showing what the parties intended. (*Owsley* v. *Matson*, 156 Cal. 401 [104 P. 983] ; *Horton* v. *Winbigler*, 175 Cal. [149] 150 [165 P. 423].) From the testimony quoted by the appellants in their opening brief it appears that respondents, J. L. Kirkham and J. A. Kirkham, W. M. Barr, cashier of the First National Bank of Sanger, to whom the parties went to negotiate the loan, and who was first requested to draw the contract, and Monte Kirkham, son of one of the respondents, each testified that the contract intended by all the parties to be executed was the contract as found and reformed by the court."

Subsequently, in *Bank of America* v. *Granger*, 115 Cal. App. 210, 220 [1 P.2d 479], it was held that the trial court improperly excluded evidence of one party's intention at the time of the contract's execution: "While the witness Granger was being examined by the plaintiff he was asked: 'What was your intention with respect to the name of the bank to which

that guaranty was running at the time you signed it?' Again, he was asked, 'Did you know at the time you signed this agreement the exact name of the institution?' To those questions objections were interposed and the objections were sustained. These rulings were erroneous. The very issue before the court was that of ascertaining, among other things, what were intended to be the legal consequences of the several guaranties. (Civ. Code, § 3401.) That issue could not properly be determined until all such matters were gone into and the evidence was fully before the court.''

■ Although defendant has endeavored to distinguish the above cases, there is this further authority for the admission of the agents' statements, at least those of De La Soto. Section 289, Restatement Second of Agency, declares: ''Evidence of statements of agents, whether or not such statements are authorized, is admissible in favor of and against the principal, if admissible under the general rules of evidence as to the admissibility of such statements by persons not agents.'' Comment c to section 289 reads: ''*Statements of state of mind.* Evidence of statements by an agent introduced in order to show the purpose for which he did an act or to show his knowledge or state of mind is admissible in favor of and against the principal under the rules relating to the introduction of evidence for this purpose. Statements by an agent are not excluded because made by an agent. If his knowledge or condition of mind or purpose is relevant to the cause of action which is being brought, either party can introduce evidence relevant to show this. . . .''

■ Defendant's final contention challenges the award of interest. The following facts are pertinent to a determination of this question: By letter dated July 26, 1957, defendant denied any liability under its policy; this letter followed plaintiff's notice to defendant of the fire loss and a subsequent investigation conducted by defendant. Defendant having denied liability for the loss, the trial court found (at the time reformation was decreed) that the actual cash value or amount of the loss had not been agreed to pursuant to the provisions of the policy. At the further hearing on the issue of damages, following defendant's attempted appeal from the interlocutory judgment, plaintiff introduced into evidence a report prepared by Mr. Mat Graham, a qualified appraiser, dealing with the amount of loss sustained. Dated September 19, 1957, this report was received without objection on the

part of defendant, its counsel having stipulated to the appraiser's qualifications. The amount of loss found by the court is the exact amount shown in this report.

Shortly prior to the hearing, it further appears, defendant's counsel asked that plaintiff file a proof of loss as part of the procedure for ascertaining the amount thereof; the requested instrument was duly executed, returned to counsel and later received in evidence. Therein reference is made to the Graham report, and the amount claimed is Graham's determination of the loss plus interest. At the time the proof of loss was offered in evidence, defendant's counsel stated: "I will make this statement, as I told Mr. Loomis, we are not making any claim that either failure to file proof of loss or late filing of proof of loss bars plaintiff's right to recover in this case. The only purpose of my offer: we feel it may bear on the question of interest."

Finally, there was evidence that in 1957 plaintiff caused a proof of loss to be filled out. When given to an adjuster from defendant company, he refused to accept it; he stated at the time that he did not recognize that plaintiff was insured against the loss sustained.

The governing law, as both parties point out, is found in section 3287 of the Civil Code: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt." It is first contended by defendant that since the loss under the subject policy was not payable until at least 60 days after filing of proof of loss and since such proof of loss was not filed by the plaintiff until 60 days before entry of the final judgment, said judgment should not have included an allowance of interest. ■ But this contention ignores the well-recognized rule that "the insurer may not repudiate the policy, deny all liability, and at the same time be permitted to stand on a provision inserted in the policy for its benefit." (*Grant* v. *Sun Indemnity Co.*, 11 Cal.2d 438, 440 [80 P.2d 996].) ■ In a case not inapposite factually from that at bar, this court quoted the above statement in *Grant* and concluded that "Under these facts, Chase was entitled to interest at the legal rate to be calculated from the date when the companies should have made payment under their policies, which

is not later than that on which they repudiated liability or finally refused to pay." (*Chase* v. *National Indemnity Co.*, 129 Cal.App.2d 853, 865 [278 P.2d 68].) Because of the similarity of facts (as just noted), defendant also relies upon the *Chase* case for the proposition that waiver of a party's rights under a contract of insurance will not be presumed or inferred unless the opposite has been misled to his prejudice into the honest belief that such waiver was intended or consented to. It claims that plaintiff was not so misled, but we cannot agree. Thus, although the interlocutory judgment provided for certain procedures to determine the amount of loss, at the further hearing (following remand) defendant refused to agree or stipulate to the amount of loss lest its right to contest the question of liability might be thereby affected; too, there was defendant's untimely appeal which has further delayed final collection of the amount due.

Defendant also contends that plaintiff's claim was unliquidated and accordingly any interest prior to judgment is not allowable. It argues that "Interest has relation to an ascertained principal sum" ( *Morris* v. *Standard Oil Co.*, 192 Cal. 343, 356 [219 P. 998, 30 A.L.R. 103]) ; therefore, if the person liable does not know the sum he owes and therefore can be in no default in not paying, interest should not be allowed. (*Curtin* v. *State*, 61 Cal.App. 377 [214 P. 1030].) But section 3287, *supra*, plainly provides that interest runs not only on claims "certain" but "*capable of being made certain by calculation.*" In *Koyer* v. *Detroit F. & M. Ins. Co.*, 9 Cal.2d 336, 345 [70 P.2d 927], the court declared : " 'It would seem to admit of no doubt that an ordinary fire or earthquake loss is adjusted by calculation, whether it be a total or a partial loss. Preliminary proofs of loss are calculations of the loss, as are also the estimates of appraisers, and these are the methods of adjustment contemplated by the parties and stipulated in the policies. Resort may be had to court action only in the event the calculations of the parties or those of their appraisers are not in agreement.' '' In the present case the report of Mr. Graham, whose qualifications as an appraiser were stipulated to by defendant, was dated less than 90 days after the fire; it was received in evidence without objection and without any apparent question as to the determination therein reached. We are satisfied that the procedures suggested in *Koyer* were followed in the case at bar and that plaintiff's claim was made certain by the appraiser who undertook to make the necessary calculations.

No other points require consideration.

The judgment appealed from, denominated "Final judgment for payment of money," is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied August 29, 1963, and appellant's petition for a hearing by the Supreme Court was denied October 1, 1963.