[Civ. No. 22482. First Dist., Div. One. Nov. 26, 1965.]

NANCY J. GILLIS, Plaintiff and Respondent, v. SUN INSURANCE OFFICE, LTD., Defendant and Appellant.

Thornton & Taylor and Evans M. Taylor for Defendant and Appellant.

Sidney Rudy, Richard N. Rapoport and Wayne H. White for Plaintiff and Respondent.

SIMS, J.—Defendant insurer has appealed from a judgment, following trial by the court, which awarded plaintiff, as assignee of the alleged insured under its policy, the sum of $3,365.03, together with interest from April 18, 1963, on account of a loss which the trial court found came within the provisions of the policy.

Appellant contends that the owner of the property, which is one of plaintiff's assignors, was not a party to the contract of insurance; that the loss was one which is excluded by the terms of the policy; and that the damages are erroneously computed. The foregoing contentions are accompanied by specific assignments of alleged errors of the lower court in making its findings of fact and conclusions of law, and in failing to find as requested by appellant.

An examination of the record reflects that the findings of fact made by the trial court, and its conclusions of law and the judgment which are predicated thereon are, with the exception of a minor adjustment to the amount of damages, sustained by the evidence and the applicable law.

The pertinent facts, as set forth in the findings and where disputed, as reflected by the evidence, are as follows:

During the period from May 3, 1961, to and including May 7, 1962, Trident, Inc., was a corporation duly organized and existing under the laws of this state. On May 7, 1962, Kingston Trio, Inc., a similar corporation, became the successor in interest to Trident, Inc., by means of a merger carried out pursuant to section 4124 of the Corporations Code of the State of California. First, Trident, Inc., and then Kingston Trio, Inc., as its successor, owned and operated the Trident Restaurant in Sausalito.

In July 1962 docking facilities were constructed on the water side of the restaurant. These facilities, about 96 feet long, consisted of three fibre glass float sections. They were each reinforced with two by ten and two by six timbers and bolted together with the use of steel plates. The whole thing was designed so that if there was a failure the failure would be complete. A gangway was attached to the existing dock by a hinge which was fabricated out of a 1¼-inch pipe inside sections of 1½-inch pipe that were respectively attached to the fixed deck off the restaurant and the gangway. The pipes were held together by pipe caps on the ends of the inner pipe. The other end of the gangway had steel wheels with rubber tires which rested on the float. Subject to the terms of a conditional sales contract, Kingston Trio, Inc. was the owner of these facilities at all times from their construction to their loss.

On July 12, 1962, defendant issued its policy of fire insurance "On Docks and Piers Situate: Bridgeway, Sausalito, California" covering the foregoing docking facilities for a term of three years from July 12, 1962. The policy named "Trident, Inc." as the insured and contained a loss payable clause to "United States Leasing Corporation" as mortgagee. The court's findings and conclusions and the express terms of the policy may be set forth more appropriately under the points to which they relate.

On or about January 30, 1963, a violent windstorm arose and caused the gangway to be lifted up and to fall violently upon the docking facility, and as a result thereof the facility

was caused to subside into the water. Appellant does not question the last mentioned finding of fact, but does complain of the court's failure to find that the damage to the facility was contributed to and aggravated by water and waves. Evidence on this point is hereinafter set forth.

The court found cost of repairs in the sum of $3,365.03. The parties stipulated at oral argument that $50 of this sum should be remitted. Appellant further urges that all, or, in any event, an appreciable portion of the remaining cost is not attributable to the risks covered by the policy, and that the court erred in fixing the date from which interest would run.

Kingston Trio, Inc. filed claim and proof of loss with defendant on April 18, 1963. Defendant refused to pay. Kingston Trio, Inc. and United States Leasing Corporation thereafter assigned their claims to plaintiff, who was granted judgment as such assignee.

### *Respondent was entitled to sue on the claim as assignee of Kingston Trio, Inc.*

■■■ The complaint alleged that the policy upon which the action is predicated was issued to and insured Trident, Inc. against direct loss to the insured property by windstorm. The answer admitted the foregoing, and in denying liability contains a recital that "it is admitted that said policy insured docks and piers at Bridgeway, Sausalito, California." As a separate defense the defendant alleged: "That in and by said policy of insurance it was and is provided that said policy cannot be assigned without consent to [*sic*] this defendant and that it would be void if the insured concealed material facts; that defendant never consented to assignment of said insurance to the existing corporation of Kingston Trio, Inc. or to plaintiff GILLIS and that said changes of name, merger and legal assignment were never disclosed to defendant by its insured, Trident, Inc."

The trial court found that the policy was issued in the name of Trident, Inc. as a result of mistake; and that it insured the docking facility. It concluded as a matter of law that on the date in question a valid contract of insurance was in full force and effect between appellant, as insurer, and Kingston Trio, Inc., as insured, covering the docking facility. Appellant attacks the foregoing findings and conclusions and those related thereto which refer to compliance with terms of the policy by Kingston Trio, Inc., and its assignment to

respondent. It also complains of the failure of the court to expressly find that the policy provisions required the consent of the insurer to an assignment of the policy, and that appellant had not consented to any such transfer; and the court's failure to render conclusions of law that Trident, Inc., as the named insured, had no insurable interest in the property, and that Kingston Trio, Inc. and respondent, as its assignee, had no greater rights.

Neither lack of insurable interest in Trident, Inc., nor lack of consent to assignment is determinative of the rights of respondent and her assignor in this case. It is true that the contract is void if the insured has no insurable interest; that such interest must exist when the insurance takes effect and when the loss occurs; and that any stipulation to the contrary is void. (Ins. Code, §§ 280, 286 and 287.) Nevertheless the interest of Trident, Inc. cannot be in issue here. The complaint alleged (and thereby created an ambiguity with the allegations, first referred to herein, which state that a policy was "issued to" and "insured" Trident, Inc.) that Trident, Inc. ceased to exist more than two months before the policy was issued. It, therefore, not only had no interest in the property the policy purported to insure, but could not even be a party to that contract. (See *J. C. Peacock, Inc.* v. *Hasko* (1960) 184 Cal.App.2d 142, 149-152 [7 Cal.Rptr. 490]; and cf. *J. C. Peacock, Inc.* v. *Hasko* (1961) 196 Cal. App.2d 363, 364-370 [16 Cal.Rptr. 525].)

Similarly it is futile to speculate on whether or not Trident, Inc. could or did assign the policy to Kingston Trio, Inc. (see Ins. Code, §§ 2071, 2078; *Bergson* v. *Builders' Ins. Co.* (1869) 38 Cal. 541, 542-545; and *Greco* v. *Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 682 [12 Cal.Rptr. 802]); or whether or not the insurance would follow a transfer of the property from the insured to another (Ins. Code, § 305; and see *Pacific Indem. Co.* v. *Industrial Acc. Com.* (1934) 136 Cal.App. 158, 161-162 [28 P.2d 397]; and cf. *Capital Glenn Min. Co.* v. *Industrial Acc. Com.* (1932) 124 Cal.App. 79, 83 [12 P.2d 122]). At the time the insurance policy was issued Trident, Inc. was defunct, the property was owned by Kingston Trio, Inc. and there was never any attempt to transfer the insurance or the property after it was issued.

Further inquiry must be directed to a determination of whether or not appellant contracted with anyone, and if so whether or not that party had an insurable interest. Both parties have referred to *Strauss* v. *Dubuque Fire & Marine*

*Ins. Co.* (1933) 132 Cal.App. 283 [22 P.2d 582]. In that case a policy was issued in the name of three individuals followed by the phrase "a corporation." No such corporation existed, but there was a corporation named "Allied Box & Excelsior Company" which owned the property which was the subject of the insurance. The court denied recovery to the plaintiffs whose names appeared in the policy on several grounds, to wit: they were not the owners of the property; they suppressed the true name of the owner which if revealed would have resulted in rejection of the application for insurance; they failed to pay the premiums; and swore falsely in regard to the proofs of loss. The case fails to illuminate the instant problem. Since in that case suit was brought by the nonexistent corporation to recover for loss to property, which was owned by another at the time the policy was issued and at the time of loss, it may demonstrate that suit would not lie on the claim herein involved in the name of the nonexistent Trident, Inc. The court particularly pointed out: "There was no allegation of mistake and there is no finding of such an issue." (132 Cal.App. at p. 291.)

*Capital Glenn Min. Co.* v. *Industrial Acc. Com., supra,* 124 Cal.App. 79, which is cited and distinguished in *Pacific Indem. Co., supra,* (136 Cal.App. at p. 161), is more persuasive. It holds that a compensation insurance carrier which renews a policy originally issued to a partnership, which had been transformed into a corporation, when it had information which should place it upon inquiry regarding the identity of the assured before issuing the new policy, is estopped to deny that it insured the corporation. ▮ The record in the instant case is silent on what transpired in connection with the issuance of the policy upon which this action is predicated. There are present, however, several factors noted in *Capital Glenn.* The named insured was not in existence when the policy was written; the appellant insurer admittedly intended to insure the property in question; there was no fraud or misrepresentation on the part of the insured; there was no increase of hazard on the part of the insurance company on account of the error in the name of the insured or because of the merger; the management remained the same; and the insurer accepted and retained the premium payments. The only missing element is the lack of evidence to show whether or not appellant or its agents had any information which would put them on inquiry as to the true identity of the owner of the property to be covered by the insurance.

The foregoing circumstances are sufficient, however, to sustain the trial court's finding that Trident, Inc. was designated in error and that appellant intended to insure the interests of the operators of the restaurant premises, who proved to be Kingston Trio, Inc., and the conditional vendor or "lessee" which had a security interest in the property. (See *Winchester* v. *General Cab Co.* (1936) 13 Cal.App.2d 551, 554-556 [57 P.2d 206]; and *Goss* v. *Security Ins. Co.* (1931) 113 Cal.App. 577, 579-581 [298 P. 860].)

Respondent has pointed out: "To constitute a valid contract of insurance the minds of the parties must have met on the identity of the person with whom they are dealing." (*K. C. Working Chemical Co.* v. *Eureka-Security F.&M. Ins. Co.* (1947) 82 Cal.App.2d 120, 131 [185 P.2d 832].) It is also axiomatic that the court cannot reform and remake a contract for alleged mistake where there was never any such common intent. (*Milwaukee etc. Co.* v. *Palatine Ins. Co.* (1900) 128 Cal. 71, 74-75 [60 P. 518]; *National Auto. Ins. Co.* v. *Industrial Acc. Com.* (1938) 27 Cal.App.2d 225, 227 [80 P.2d 1024].) In each of the cases last cited the court was faced with two alternative contracts, and refused to disturb that which was written and agreed to. In this case there is either a reformed contract with those entitled to the property which the appellant intended to insure and charged a premium for, or no contract at all. Under these circumstances, and in the absence of any show of prejudice to the insurer, the trial court properly granted reformation for mistake and recognized the rights of Kingston Trio, Inc. under the contract. (See *National Auto. & Cas. Co.* v. *Industrial Acc. Com.* (1949) 34 Cal.2d 20, 24-25 [206 P.2d 841]; *Gillanders* v. *DaSilva* (1931) 212 Cal. 626, 630-632 [299 P. 722]; *Maier Brewing Co.* v. *Pacific Nat. Fire Ins. Co.* (1963) 218 Cal.App.2d 869, 874 [33 Cal.Rptr. 67]; *Beach* v. *United States Fid. & Guar. Co.* (1962) 205 Cal.App.2d 409, 416 [23 Cal.Rptr. 73]; *American Surety Co.* v. *Heise* (1955) 136 Cal. App.2d 689, 695-696 [289 P.2d 103]; *Eagle Indem. Co.* v. *Industrial Acc. Com.* (1949) 92 Cal.App.2d 222, 224-225 [206 P.2d 877]; *Cantlay* v. *Olds & Stoller Inter-Exchange* (1932) 119 Cal.App. 605, 614 [7 P.2d 395].)

Appellant finally asserts that to permit respondent to obtain relief by way of reformation of the policy for mistake is not warranted by the pleadings. As noted above the complaint is ambiguous. It contains allegations, which appellant originally denied for lack of information and belief, and sub-

sequently admitted at the trial, that show that the company which was named as insured ceased its existence over two months before the policy was issued. Despite the ambiguity raised by the allegations relating to the issuance of a policy to, and the insuring of Trident. Inc., appellant was placed on notice by the complaint that Kingston Trio, Inc. was claiming to be entitled to the rights conferred by the policy issued after the merger. Although the pleading shows some confusion as to the theory on which respondent sought to recover, in the absence of attack on the pleadings by demurrer or motion, and after trial, this court should not rule out the finding of mistake made by the trial court which is sustained by the evidence. (See *Vecki* v. *Sorensen* (1954) 127 Cal.App. 2d 407, 412-415 [273 P.2d 908].)

It being established that Kingston Trio, Inc. was entitled to the benefits of the policy as the intended insured, no issue is or can be raised concerning the established assignment of the claim to plaintiff. (See Ins. Code, § 520; *Greco* v. *Oregon Mut. Fire Ins. Co., supra,* 191 Cal.App.2d 674, 682-683.)

### *The loss was not excluded by the terms of the policy.*

 The trial court found that ''[T]he policy of fire insurance issued by defendant insured the said docking facility against loss or damage caused by wind,'' and that it ''excluded coverage for loss occurring to the docking facility caused by water or damage from, contributed to or aggrevated [*sic*] by surface water or waves.''

The foregoing substantially sets forth the pertinent provisions of the policy. On its face the policy is a ''California Standard Form Fire Insurance Policy'' insuring against loss from fire and lightning. For an extra premium there was issued and attached to the policy an ''Extended Coverage Endorsement (Perils of Windstorm and . . . [naming other perils])'' which, insofar as is material herein recites:

''In consideration of the premiums for this coverage, and subject to the provisions herein and in the policy to which this endorsement is attached including endorsements thereon, this policy is extended to insure against direct loss by windstorm [naming other perils], except as hereinafter provided.

''Provisions applicable only to windstorm and hail: [none asserted as material herein].

[There follows provisions applicable to other specific perils].

"Water Exclusion: This company shall not be liable for loss caused by, resulting from, contributed to or aggravated by any of the following—(a) Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not; . . ."

In respect of the loss the trial court expressly found: "On or about January 30, 1963, a violent windstorm arose which caused the gangway to be lifted up and fall violently upon the docking facility"; and, "As a result of the gangway striking the docking facility, it was caused to subside into the water."[1]

Appellant complains of the failure of the court to find that the loss was suffered during a storm of high winds and heavy waves and at a time when the waters surrounding the float were turbulent; that the float was damaged after the gangway was dropped onto one section and broke up during the storm and while the water was turbulent; that the damage to the float was caused by wind and water; and that the damage to the float was contributed to and aggravated by water and waves.

The relevancy and materiality of the requested findings depends on (1) whether or not they are compelled by the evidence, and (2) if so, whether they require different conclusions of law.

At the trial respondent conceded that the water contributed to the ultimate destruction of the whole facility, but insisted that the proximate cause of the facility going down was the gangway striking the float. In his memorandum opinion the trial judge stated: "The only fair inference to be drawn from the evidence is that the damage proved was caused by wind and water, in that sequence." In her brief, respondent concedes that there is no disputing the fact that the final extent of loss was in part due to water damage, but points out that the evidence sustains the implied findings that the wind was the proximate cause of the damage.

The evidence most favorable to respondent reflects that on an undetermined Sunday in the latter part of January 1963,

---

[1] The testimony is open to the inference that the gangway was lifted up, broken and propelled back into the water by the turbulent action of the waves rather than the wind. Speculation in this regard is precluded by the trial court's express finding on conflicting evidence which is not questioned by respondent.

a storm came up about 3:30 or 4 o'clock in the afternoon. The wind was blowing, and the water was turbulent. Within a period of minutes the rain came down and a very turbulent wind came up and threw down two tables with coffee makers on top, overturned a chair, and blew stuff on the dock "like a gale force." The gangway which was attached to the float was picked up and blown off its hinges, which sheared off, and landed down on a dinghy which was right next to the dock, and hit the side of the dock itself. The gangway put a hole in the dinghy, and created a sharp vibration on the dock which loosened the bolts in the sections of the float. Within an hour or an hour and a half the dock began to break up and sink.

The owner of the dinghy went down that evening and dragged his boat up on top of the dock. When he left the north end of the float was slightly lowered and the rest of it was all right. The next morning the storm still persisted, the waves were very high and the water was going over the top of the dock. The dock was sunk further and it had broken in two pieces. One part, which had broken—"exploded"—right through the center of the pontoon about one foot on one side of the connection, was submerged, and two parts were still floating and securely fastened together. By 11:30 a.m. the other two sections had submerged. A diver descended to make observations, but it was too dangerous to work on the dock then.

The builder of the dock opined that the whole thing was so designed that if it had a failure the failure would be complete; that if one section was submerged the wave action could cause sufficient force to break the pontoons in the manner in which he found them; and that it was possible that the force of the gangway on top of the first pontoon could have cracked it.

From the foregoing it is clear that the concessions made by respondent and the trial court are justified if not compelled by the evidence. How can it be said that the loss was not contributed to or aggravated by water or waves? Respondent does not attempt to answer this question, but is content to rest on the decision in *Sabella* v. *Wisler* (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889], in which it was held that an insurer, which insured a house "against all risks of physical loss except as hereinafter excluded," was liable where the negligence of a third party, rather than the acknowl-

edged settling which resulted therefrom, was the efficient proximate cause of the loss, even though the policy provided under "Exclusions, . . . This endorsement does not insure against *loss* . . . by . . . settling." (59 Cal.2d at pp. 26 and 31-33.) The court construed the provisions of sections 530 and 532 of the Insurance Code as follows: "Defendant insurer attempts to establish its non-liability by reliance upon section 532 of the Insurance Code, which states that 'If a peril is specially excepted in a contract of insurance and there is a loss which would not have occurred but for such peril, such loss is thereby excepted even though the immediate cause of the loss was a peril which was not excepted.' The insurer's argument is that since in a factual sense the loss herein would not have occurred 'but for' the settling of the underlying earth and house, the plaintiffs are thereby exempt from coverage for this loss. But section 532 must be read in conjunction with related section 530 of the Insurance Code (*Pacific etc. Co.* v. *Williamsburgh City Fire Ins. Co., supra,* 158 Cal. 367, 372 [111 P. 4]), and section 530 provides that 'An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause.' It is thus apparent that if section 532 were construed in the manner contended for by defendant insurer, where an excepted peril operated to any extent in the chain of causation so that the resulting harm would not have occurred 'but for' the excepted peril's operation, the insurer would be exempt even though an insured peril was the proximate cause of the loss. Such a result would be directly contrary to the provision in section 530, in accordance with the general rule, for liability of the insurer where the peril insured against proximately resulted in the loss. (See 6 Couch, Insurance (1930) § 1464.)

"It would appear therefore that the specially excepted peril alluded to in section 532 as that 'but for' which the loss would not have occurred, is the peril proximately causing the loss (see *Herron* v. *Smith Bros., Inc.,* 116 Cal.App. 518, 521 [1] [2 P.2d 1012]), and the peril there referred to as the 'immediate cause of the loss' is that which is immediate in time to the occurrence of the damage. (See Black's Law Dictionary (4th ed. 1951) 'Immediate Cause,' p. 884; 6 Couch, Insurance (1930) § 1463, pp. 5298-5299; 28 Cal.Jur. 2d, Insurance, § 446, pp. 160-161.)" (59 Cal.2d at pp. 33-34.)

Respondent points out that although the ultimate loss would not have occurred "but for" the water and waves, the peril proximately causing the loss was the windstorm which directly caused the original damage to the docking facility. The fact that the immediate cause of loss was the natural infiltration of water into the pontoons, the ensuing partial sinking, and the resulting breaking up and total submergence from action of the natural forces of the environment in which the dock by its inherent nature was placed, should not defeat recovery.

Appellant insists that the foregoing decision is not controlling because the use of the words *"direct* loss by windstorm" in reference to the peril, and "caused by, resulting from, *contributed to* or *aggravated by"* (italics added) in connection with the exclusions voids the application of the usual rule of proximate cause, and clearly and unequivocally expresses the intent that regardless of the initiating or proximate cause of damage, no recovery can be had if an excluded cause has any part, no matter how small, in causing the damage. The cases on which it relies establish that where the damage results from the combined joint, but independent, action of a peril insured against, and an excluded peril, the foregoing and similar language will suffice to relieve the insured from liability. (See *Newman* v. *Great American Ins. Co.* (1965) 86 N.J. Super. 391 [207 A.2d 167]; *Great American Ins. Co.* v. *Carr* (1964) (Tenn. App.) [11 Fire & Casualty Cases 1414]; *Cox* v. *Queens Ins. Co. of America* (Tex. Civ. App. 1963) 370 S.W.2d 206; *Palatine Ins. Co.* v. *Coyle* (Tex. Civ. App. 1917) 196 S.W. 560, affd. (Tex. Com. App.) 222 S.W. 973; and *Wooton Hotel Corp.* v. *Northern Assur. Co., Ltd.,* (E.D., Pa. 1944) 57 F.Supp. 112, affd. (3d Cir. 1946) 155 F.2d 988, cert. den. (1946) 329 U.S. 758 [67 S.Ct. 111, 91 L.Ed. 654].)

None of the foregoing cases specifically meets the situation in *Sabella* where the action of the peril insured against operates through an excluded peril to cause the damage. Here the facts justify a finding that the injury to the docking facility caused by the fall of the gangway—a direct loss by the windstorm which broke off and permitted the gangway to fall on the dock—was the start of a chain of events which permitted the waves to cause damage to the float, first through penetrating the cracked pontoons and submerging it in part, and then through the unnatural strain on the partially submerged facility which resulted in further breaking up and the sink-

ing of the whole. Under such circumstances the action of the water and waves, although contributing to and aggravating the damage, cannot be said to be an independent contributing or aggravating cause. It may be inferred that in the absence of the blow from the gangway, the docking facility would have ridden out the storm with no appreciable damage.

Factual basis for this conclusion of the lower court is found in evidence which reflects that the docking facility had passed through two prior storms, where it was only subjected to the actions of the water and waves, with but minor damage.

Legal support for respondent's position is found in *Sauer* v. *General Ins. Co.* (1964) 225 Cal.App.2d 275 [37 Cal.Rptr. 303], wherein the policy used the same qualifying words which have been emphasized above in describing the peril— " '*direct* loss to the property covered caused by: . . . 15. Accidental discharge, leakage or overflow of water. . . .' " The "Earth Movement Exclusion" excluded, as here, " 'loss caused by, resulting from, *contributed to,* or *aggravated by* . . . earth sinking. . . .' " (Italics added.) The trial court found that leakage within the coverage of the policy caused settlement damage. It denied the insurer's attempt to exclude the loss under a water exclusion and a settling and cracking exclusion, but found "that while the loss claimed was not caused by or resulting from the settling of the ground, such loss was contributed to and aggravated by the earth sinking following the water leak." The appellate court applied the principles set forth in *Sabella* and reversed a judgment for the insurer. It upheld the insured's contentions that the loss "was not the result of 'earth movement,' 'earth sinking,' or 'settling of foundations' or of 'water below the surface of the ground' within the exclusionary terms in their policy"; and that "the uncontroverted evidence clearly shows that defendant is liable within the terms of its policy because the accidental leakage and discharge of water upon and into the ground from within the plumbing system of their house was the efficient proximate cause of their loss rather than settling or sinking of the earth." (225 Cal.App.2d at pp. 277-278.) The decision is unsatisfactory in failing to face up to the finding, which was compelled by the evidence, that in fact the loss was contributed to and aggravated by the earth sinking following the water leak. In *Sabella* it was recognized that the settlement caused the damage, but resort to the exclusionary clause was denied

because the waste water emptying into the loose fill was the "efficient proximate cause"—"the predominating or moving efficient cause" of the loss. (59 Cal.2d at pp. 31-32.) Nevertheless *Sauer* appears to extend *Sabella* to the extent that neither contribution nor aggravation as a matter of law will bar recovery where they result from a peril covered by the insurance.

Here the damage from windstorm did not continue to operate in the sense that the leaking sewage in *Sabella* and leaking water in *Sauer* kept infiltrating the ground until settling occurred. In those cases there is in fact no independent intervening cause as distinguished from an effect which is but a conduit to further results. The wind did not continue to damage the float. It did, however, create a condition that permitted natural forces, which alone may have caused no damage, to effect the damage for which recovery is sought. Under such circumstances, considerations similar to those applied in *Sabella* and *Sauer* generally govern.

In *Newman* v. *Great American Ins. Co., supra,* 86 N.J. Super. 391 [207 A.2d 167], upon which appellant relies, the action was to recover for destruction of a beachfront summer home and its contents in a severe storm. On conflicting evidence the jury returned special verdicts indicating that the loss was not caused solely and exclusively by either the wind or the sea, but that it resulted from the combined joint action of, or was contributed to or aggravated by the sea. The court upheld the instructions given by the trial court, and its refusal to give those offered by plaintiff. It rejected plaintiff's argument that if the wind was the dominant cause, the insured should recover despite the exclusion, as not pertinent to the facts presented. The court reviewed some of the literature on the windstorm clause[2] and concluded: "We find the language of the two endorsements [extended coverage, windstorms, etc.; and additional extended coverage, collapse of buildings; and their attendant exclusions] complex and ambiguous, and so have courts and insurance commentators everywhere." (207 A.2d at p. 171.)

---

[2]Grissom, *The Scope of Windstorm Coverage,* Insurance L.J., Oct. 1960, p. 615; Brewer, *Concurrent Causation in Insurance Contracts,* 59 Mich. L. Rev. (1961) 1141; Note. 33 N.C.L. Rev. (1955) 288; Annotation, Causes of Loss Under Windstorm Insurance Coverage, 93 A.L.R.2d (1964) 145; and see also 11 Couch on Insurance 2d (1963) §§ 42:333-42:345, pp. 145-159, and §§ 42:611-42:615, pp. 303-306; 6 Couch on Insurance (1930) §§ 1462-1474, pp. 5292-5324; 5 Appleman Ins. Law & Practice (1941) §§ 3142 and 3144, pp. 287-290.

A review of the precedents collected in the works which have been referred to reflects that "the mass of conflicting decisions regarding the proper limits of the insurer's liability for damage resulting from windstorm make it evident that it is the likelihood of litigation, not the certainty of interpretation and loss settlement, which has been substantially increased." (Grissom, *The Scope of Windstorm Coverage*, Insurance L.J., Oct. 1960, p. 615, at p. 639.) In an attempt to bring order out of chaos that author has suggested categorization as follows: "In either event, the initial question posed is simply one of causation—that is, what was the specific manner in which the loss was occasioned? Four different possibilities exist in this regard, for the damage may have been (1) caused exclusively either by the windstorm or the particular contributing cause; (2) produced by some other element propelled or driven by the windstorm; (3) occasioned by the contributing causes acting in succession to each other (one element of nature operative first, affording a predicate for later damage by the other); or (4) the result of the concurrent and simultaneous effect of the contributing causes. Once this primary question of causation has been resolved, further determination must then be made of the scope of the insurer's liability in whichever of the four possibilities is found to exist." (*Id.* p. 631.)

In the instant case it actually cannot be ascertained whether the final loss was caused exclusively either by the windstorm or by the excluded waves. In either of these events the result is obvious. It does appear that one of the causes of the loss was produced by some other element propelled and driven by the windstorm. There can be no question that the original damages caused by the gangway when it struck the dock was a loss from windstorm. (*Firemen's Ins. Co. of Newark* v. *Senseney* (4th Cir. 1957) 250 F.2d 130; *Pearl Assur. Co.* v. *Stacey Bros. Gas Const. Co.* (6th Cir. 1940) 114 F.2d 702; *Phenix Ins. Co.* v. *Charleston Bridge Co.* (4th Cir. 1895) 65 F. 628 [13 C.C.A. 58]; *Sun Ins. Office, Ltd.* v. *Guest Camera Store, Inc.* (1963) 108 Ga.App. 339 [132 S.E. 2d 851]; *Gerhard* v. *Travelers Fire Ins. Co.* (1945) 246 Wis. 625 [18 N.W.2d 336]; *Queen Ins. Co.* v. *Hudnut Co.* (1893) 8 Ind.App. 22 [35 N.E. 397]; 11 Couch on Insurance 2d, § 42:335, p. 146; Grissom, *op. cit.* p. 632; and cf. *Wootton Hotel Corp.* v. *Northern Assur. Co., Ltd., supra,* 57 F.Supp. 112, where the water which was driven by the wind was, as here, expressly excluded.)

The third category presents the problem of whether the insured is barred whenever the excluded cause contributes to the loss. Where the windstorm causes the initial damage and leaves the insured property in such a vulnerable state that a subsequent force of nature causes loss, the insured has generally been permitted to recover. For example in *Providence Washington Ins. Co.* v. *Cooper* (Tex. Civ. App. 1949) 223 S.W.2d 329 (148 Tex. 644), the court held that notwithstanding the erroneous finding of the jury that the building was not damaged by snow, an expressly excluded cause of loss, the judgment on the verdict for the insured should be affirmed because windstorm damage which preceded the snow had weakened the roof and was the efficient cause which set the contributing cause in motion. (The court distinguished *Palatine Ins. Co.* v. *Coyle, supra,* 196 S.W.2d 560, on which appellant relies, on the grounds the excluded high water was simultaneously combining with the wind to concurrently cause the damage. Cf. also *Cox* v. *Queens Ins. Co. of America, supra,* 370 S.W.2d 206, which fails to mention the *Cooper* case.) Similar results are found in *Stephens* v. *Cotton States Mut. Ins. Co.* (1961) 104 Ga.App. 431 [121 S.E.2d 838]; *Anderson* v. *Connecticut Fire Ins. Co.* (1950) 231 Minn. 469, 476 [43 N.W.2d 807]; *Trexler Lumber Co.* v. *Allemannia Fire Ins. Co.* (1927) 289 Pa. 13 [136 A. 856]; and *Marks* v. *Lumbermen's Ins. Co.* (1946) 160 Pa. Super. 66 [49 A.2d 855].) Where the property is picked up by the wind and deposited where it is subjected to further damage by high water, the insurer cannot defeat recovery by resort to a clause which excludes the latter peril. (*Ebert* v. *Pacific Nat. Fire Ins. Co.* (La. App. 1949) 40 So.2d 40; and *Pennsylvania Fire Ins. Co.* v. *Sikes* (1946) 197 Okla. 137 [168 P.2d 1016, 166 A.L.R. 375].) In the case last cited the opinion recites: "Common experience and understanding suggest that when personal property of this nature is blown into a body of water that some water damage will result before the property can be recovered. It is fair to assume that under these facts this incidental water damage was within the terms of the policies and contracts of the parties at the time they were made." (197 Okla. at p. 140, 168 P.2d at p. 1019.)

So here common experience and understanding suggest that when personal property of the nature of a floating dock is damaged so that its buoyancy is affected, some water damage will result. The record sustains the implied finding of the lower court that the windstorm alone was the dominant or

efficient cause. The foregoing makes it unnecessary to determine whether in every case of several causes, the insured may recover if one is the peril insured against. (See *Hughes* v. *Potomac Ins. Co.* (1962) 199 Cal.App.2d 239, 244 [18 Cal. Rptr. 650].) The effect of the exclusion clause on the situation where the action of the excluded peril precedes the action of the insured peril, and the situation where such causes operate simultaneously and conjointly may be left for future determination. (See Grissom, *op. cit.* pp. 634-639.) Suffice it to say that the cases cited above on which appellant relies fall in those categories.

It is concluded that the evidence is sufficient to sustain the trial court's implied finding that the windstorm was the dominant and efficient cause of the damage and loss to the insured float and docking facility, and that appellant was not prejudiced by the trial court's failure to make the findings it requested, because they would not affect the conclusions of law and judgment entered and rendered by that court.

### *Except as stipulated damages were correctly assessed.*

Appellant attacks the finding that the cost of repairs to the docking facility was $3,365.03, for which amount the court gave judgment.

At the trial there was some confusion as to whether or not one check offered by respondent for $50, dated January 22, 1963 and payable to the builder of the dock, was for the original installation or for the repairs. At the oral argument it was stipulated that the judgment should be reduced by $50.[3]

The general provisions of the policy provide: "The amount of loss for which this company may be liable shall be payable 60 days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by the filing with this company of an award as herein provided."

The pleadings admit and the findings recite that on April 18, 1963, Kingston Trio, Inc. filed a claim and proof of loss with defendant who refused to pay all or any part of said claim. Under such circumstances interest was properly

[3]It is noted, however, that if the loss occurred Sunday, January 20, 1963, this sum may have been paid White for his survey on January 21, 1963.

allowed from the time appellant admittedly rejected the claim. It cannot stand on the policy provisions, and at the same time deny liability under the policy. (See *J. J. Newberry Co.* v. *Continental Cas. Co.* (1964) 229 Cal.App.2d 728, 734 [40 Cal.Rptr. 509]; *Maier Brewing Co.* v. *Pacific Nat. Fire Ins. Co.* (1963) 218 Cal.App.2d 869, 878-880 [33 Cal. Rptr. 67]; *Chase* v. *National Indemnity Co.* (1954) 129 Cal.App.2d 853, 864-865 [278 P.2d 68].) This is not a case where liability is admitted, and the amount of loss is disputed, or where, although liability is contested, the parties proceed to determine the amount of the loss under the terms of the policy. In such cases the policy terms as to time of payment will govern. (See *Koyer* v. *Detroit F. & M. Ins. Co.* (1937) 9 Cal.2d 336, 345-347 [70 P.2d 927]; *Hughes* v. *Potomac Ins. Co., supra,* 199 Cal.App.2d 239, 253-254; and *Kahn* v. *Alemannia Fire Ins. Co.* (1936) 16 Cal.App.2d 39, 41 [60 P.2d 149].)

In the absence of any other evidence of when the claim was rejected the trial court's findings and conclusions should be sustained.

Appellant's principal contention is that only one-third of the floating dock was damaged by windstorm and that the rest was destroyed by subsequent action of the waves. (See Annotation, 93 A.L.R.2d 145, *supra,* at pp. 165-166, for cases where separation of damages is proper.) It points to the evidence narrated above concerning the observations of the dinghy owner and the original builder that two sections of the dock remained afloat until around noon the day following the original damage to the other section. The question of whether any or all of the damage and loss was caused by windstorm is one of fact. Since the evidence justifies the finding the windstorm was the dominant, efficient and proximate cause of the loss of the whole float, it likewise justifies the trial court's rejection of appellant's contention that two severable losses and not one loss ensued.

The judgment is modified by reducing the principal sum thereof $50 to $3,315.03, and as so modified it is affirmed. Respondent to recover costs.

Sullivan, P. J., and Molinari, J., concurred.