[No. 29756. Department Two. February 28, 1946.]

HERMAN H. RIDDER *et al., Appellants,* v. RAE KINGSLEY
BLETHEN *et al., Respondents.*[1]

'Reported in 166 P. (2d) 834.

*Jones & Bronson* (*Oppenheimer, Hodgson, Brown, Donnelly & Baer* and *Amend & Amend*, of counsel), for appellants.

*Holman, Sprague & Allen* and *Hulbert, Helsell & Paul*, for respondents Blethen *et al.*

*McMicken, Rupp & Schweppe*, for respondent Seattle Times Company.

BLAKE, J.—Clarance B. Blethen died testate October 30, 1941. Four sons survived him—Clarance B. Blethen, William K. Blethen, John Alden Blethen, and Francis A. Blethen. On December 30, 1929, some twelve years before his death, Colonel Blethen, on the one hand, and Bernard H. Ridder, Joseph E. Ridder, and Victor F. Ridder, co-partners, on the other, entered into a contract which contained the following paragraph:

"EIGHTH: Blethen agrees, immediately after the issuance of Class B common stock to him to make a last Will and Testament, or some other instrument in writing, which will provide in effect that his Class B common stock be held in trust by his Trustees after his death for a period of twenty-one years after the date hereof. Such last Will and Testament or other trust instrument shall also provide that Blethen's Class B common stock shall not be sold by his trustees until the termination of such trust. Such last Will and Testament or other trust instrument shall constitute, nominate and appoint the widow of said Blethen as one of the trustees, Bernard H. Ridder, another of such trustees, and Elmer E. Todd, the third of such trustees. It shall further provide that in the event of the death, resignation or disability of his widow at any time, the vacancy caused thereby shall not be filled but the surviving trustees shall act. In the event of the death, resignation or disability of Bernard H. Ridder at any time, one of his brothers shall act as trustee in his place and stead and, in the event of the death, resignation or disability of Elmer E. Todd at any time, one of the partners of the law firm now represent-

ing Blethen shall act as trustee in his place and stead. Such last Will and Testament or other trust instrument shall also provide that upon the termination of the trust, Blethen's Class B common stock shall be distributed by the trustees among the surviving sons of said Blethen and the issue of such of them as may be deceased, in equal shares, per stirpes. Such last Will and Testament, or other trust instrument, shall further provide that, in case of any difference or differences of opinion between the said trustees as to any question connected with the management of the corporation, the Class B common stock of which is to constitute the corpus of the trust, any trustee may submit such a question for arbitration, upon notice to the other trustees, to the then general manager of The Associated Press, and in any such case the decision of the said then general manager of The Associated Press shall be final and conclusive and be binding upon all of said trustees."

In his last will and testament, executed December 4, 1940, Colonel Blethen disinherited his son Clarance and bequeathed the class B stock of the Seattle Times Company— a corporation organized pursuant to the agreement with Ridder Brothers—to his sons William K., John Alden, and Francis A.

Clarance B., Jr., assigned his alleged rights under the contract of December 30, 1929, executed by his father and Ridder Brothers, to Herman H. Ridder. The latter, with Clarance, Jr., joining as coplaintiff, brought this action to establish the latter's position as a third-party beneficiary under the contract.

We shall not attempt to summarize the pleadings upon which issue was joined. It will suffice to say that the question presented to the trial court was whether Blethen, Jr., was a *donee beneficiary* in contemplation of the contract between his father and Ridder Brothers. If he was, he and his assignee are entitled to maintain the action. If, however, he was merely an incidental beneficiary in contemplation of the contract, he has no enforcible interest. 12 Am. Jur. 831, § 279.

Much evidence was introduced to determine the status of Blethen, Jr. The trial court held that he was merely an

incidental beneficiary and entered judgment dismissing the action. Plaintiffs appeal.

Appellants' assignments of error raise but two questions: (1) whether parol evidence was admissible to establish the status of Clarance, Jr., as a third-party beneficiary— donee or incidental; and (2) whether, under the evidence, the court was warranted in finding him to be merely an incidental beneficiary.

*First.* The generally accepted definition of a donee beneficiary is stated in 1 Restatement of the Law of Contracts, p. 151, § 133, as follows:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, . . . . :

"(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary; . . . ."

Appellants' assertion that Clarance, Jr., comes within this definition, under the express terms of the contract between his father and the Ridder Brothers, cannot be denied. They contend, therefore, that, since the terms of the contract are plain and unambiguous, resort may not be had to parol evidence to show his status to be other than a donee beneficiary. Solution of the question, however, is not quite so simple as that. To constitute one a donee beneficiary, it must appear that the contract was designed for his benefit, or that it was the intent and purpose of the parties to bestow a benefit or gift upon him. *Simson v. Brown,* 68 N. Y. 355; *Riegel v. Central Hanover Bank & Trust Co.,* 266 App. Div. 586, 42 N. Y. S. (2d) 657; *Burton v. Larkin,* 36 Kan. 246, 13 Pac. 398, 59 Am. Rep. 541; *Seaver v. Ransom,* 180 App. Div. 734, 168 N. Y. Supp. 454 (aff. 224 N. Y. 233, 120 N. E. 639, 2 A. L. R. 1187); *Ball v. Cecil,* 285 Ky. 438, 148 S. W. (2d) 273; *O'Neill v. Ross,* 98 Cal. App. 306, 277 Pac. 123.

■ The purpose and intention of the parties is to be ascertained from the contract as a whole, construed in the light of the circumstances under which it is made. *Grand Lodge etc. v. United States F. & G. Co.,* 2 Wn. (2d) 561, 98 P. (2d) 971; *Fidelity Trust Co. v. Travelers' Ins. Co.,* 320 Pa. 161, 181 Atl. 594; and in *Sayward v. Dexter Horton & Co.,* 72 Fed. 758, 765, 19 C. C. A. 176, 182, it is stated:

"It is not every contract for the benefit of a third person that is enforceable by the beneficiary. It must appear that the contract was made and was intended for his benefit. The fact that he is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment. It must appear to have been the intention of the parties to secure to him personally the benefit of its provisions. *National Bank v. Grand Lodge,* 98 U. S. 123; *Wright v. Terry,* 23 Fla. 160, 2 South. 6; *Burton v. Larkin,* 36 Kan. 246, 13 Pac. 398; *Chung Kee v. Davidson,* 73 Cal. 522, 15 Pac. 100; *Railroad Co. v. Curtiss,* 80 N. Y. 219; *Vrooman v. Turner,* 69 N. Y. 280; *Greenwood v. Sheldon,* 31 Minn. 254, 17 N. W. 478; *Austin v. Seligman,* 18 Fed. 520. There is nothing in the contract made by Harrington & Smith with Herrick indicative of an intention to protect Sayward from suit except for Herrick's own benefit. The parties to that agreement evidently had in view their own advantage, and not Sayward's. It was clearly for Herrick's protection primarily and chiefly that the stipulation in question was inserted. If it was the intention to protect Sayward also, that purpose was only incidental and secondary."

■ Unless the contract is expressly designed for the benefit of a third party, resort, of necessity, must be had to extrinsic evidence to ascertain whether it was the purpose and intent of the parties to the contract to bestow a benefit or gift upon a third party. This necessity was recognized by this court in *Hutton v. Gonser,* 159 Wash. 219, 292 Pac. 743, to which we shall advert later at some length. Appellants themselves recognized this, for, when the case was called for trial, their counsel, in the course of his opening statement to the court, said:

"Of course, under many of the authorities the contract which the parties had made and the language which they have used is deemed sufficient to indicate their purpose, at

least prima facie, and it was upon that theory that it seemed to me there was no occasion or would be in the opening case no occasion to go further. In fact, I think it was urged on the last hearing of the general demurrer that because the complaint did not contain specific allegations of the purpose and intent on the part of the promisee, that the demurrer should be sustained. *But, nevertheless, the whole background and testimony might just as well, I think, be presented and the logical way to do it is probably to take it up right in the first instance."* (Italics ours.)

And, again, early in the examination of appellants' first witness, their counsel stated to the court:

" . . . in order to show what purpose and object the promisees had in mind, we shall undoubtedly have to go into matters of discussion between them, which were not in the presence of the other parties to the transaction.

"Now, that, of course, I realize, is not binding on the other side, or it is not binding on Colonel Blethen; but it is relevant to the question of what these parties had in their minds and what their objects and purposes were; and if the matter of intent or purpose is relevant here, as your Honor has indicated you consider it to be—*and apparently it is under the authorities*—then certainly a party has a right to testify what is in his mind." (Italics ours.)

■ While appellants did not expressly allege in their complaint that the purpose and intent of the parties to the contract was to bestow a gift on Clarance, Jr., they took upon themselves the burden of proving the fact by parol evidence. They say they were forced into that position because of certain observations made by the court in ruling on demurrers to the complaint. We think it is apparent, however, from their counsel's own statements, that appellants voluntarily assumed the burden on the issue; and, in view of the fact that they introduced much parol evidence in support of their position, they are hardly in a position to claim error for violation of the rule. *Vieser v. Bellows,* 209 App. Div. 540, 205 N. Y. Supp. 26, appeal dismissed, 239 N. Y. 622, 147 N. E. 221; *Hackney v. Hargrove,* 259 (Mo. App.) S. W. 495; *Pathe Exchange v. Miller,* 51 App. D. C. 284, 278 Fed. 997; *Mann v. O'Neil,* 29 Wash. 115, 69

Pac. 635; *Richeson v. Wood,* 158 Va. 269, 163 S. E. 339, 82 A. L. R. 1189.

■ *Second.* On the record made, the evidence, as we view it, conclusively shows that the Blethen sons were merely incidental beneficiaries under a contract the principal purpose of which was to provide for the management and control of the Seattle Times.

The contract itself was supplemental to a tripartite agreement executed the same day (December 30, 1929) by Colonel Blethen, as party of the first part, his mother and sisters, as parties of the second part, and Ridder Brothers, as parties of the third part.

These contracts were the culmination of negotiations which started in August of that year, when Bernard H. Ridder, on a tip that the Seattle Times was for sale, visited Seattle and called on Colonel Blethen. The paper was owned at that time by the Seattle Times, Incorporated, a Nevada corporation, the capital stock of which was owned by Blethen, his mother, sisters, and sister-in-law—Blethen himself owning about thirty-five per cent of the stock.

Blethen informed Ridder that the paper was not for sale, and he made it clear at all stages of the negotiations that he was not interested in any plan whereby he and the members of the Blethen family would lose control of the Times. He desired, however, to get the control of the paper into his own hands, and, to that end, he suggested to Ridder that the stock of the other members of his family might be for sale.

The tripartite agreement was executed in contemplation of the supplemental agreement between Blethen and Ridder Brothers. The design of the tripartite agreement was the formation of a new corporation under the laws of the state of Delaware which would acquire all the stock of the Seattle Times, Incorporated (the Nevada corporation), at specified considerations to the various members of the Blethen family, who owned the stock.

The stock setup and financing plans for the new corporation were specified in great detail. We are concerned, however, only with the class B common stock, which was

to consist of one thousand shares. This, so far as we are here concerned, was the only stock having voting rights. Ridder Brothers were to get 440 shares of this class B common stock as part consideration for some $1,500,000 cash they put into the deal. Colonel Blethen was to get 560 shares of class B common stock as part consideration for his stock in Seattle Times, Incorporated, the Nevada corporation. This arrangement for the division of the class B common stock, was, of course, designed to effectuate Blethen's main objective in going into the deal: to get control of the paper into his own hands.

It was expressly provided in the tripartite contract that it should have no force nor effect unless Blethen and Ridder Brothers executed the supplemental agreement and carried out the obligations they undertook of organizing and financing the new corporation.

It is plain from the very terms of the supplemental agreement that the main purpose of Blethen and Ridder Brothers, in executing it, was to carry out the obligations assumed under the tripartite agreement and to provide for the management and control of the Seattle Times, not only during Blethen's life time, but also in the contingency of his death within twenty-one years. For, on the one hand, Blethen covenanted that he would at all times maintain his ownership and control of at least fifty-one per cent of his class B common stock for twenty-one years; and, on the other, Ridder Brothers covenanted that they would maintain control of their class B common stock for the same period.

The object which the parties had in mind in making these covenants was to ward off encroachment by any powerful newspaper publisher who might desire to get control of the Times. To maintain this objective, in the event of Colonel Blethen's death, paragraph eight was agreed upon, whereby Blethen was to make a will setting up a trust of his class B common stock, effective for the remainder of the twenty-one-year period after his death.

There were several conversations, in the course of which different proposals were made concerning the provisions

with respect to the disposition of the class B stock at the expiration of the trust. Blethen, at one time, proposed to leave the stock to his wife. Ridder Brothers objected to this and countered with a proposal that provision should be made in the will giving them the right, at the expiration of the trust, to purchase seven to ten per cent of Blethen's stock—an amount of stock sufficient to bring their holdings to fifty-one per cent of the class B stock. This proposal, Blethen rejected, saying, in effect, that he would not consent to the loss of control of the Seattle Times by the Blethen family. He came back with the proposal to leave the class B stock to his "surviving sons," which proposal was incorporated in paragraph eight.

If there is anything clear from these contracts and the circumstances surrounding their execution, it is that Colonel Blethen's unswerving purpose was to maintain his own and (after his death) his family's control of the Seattle Times. And, to this end, he disinherited his son Clarance. That he had good and sufficient reason for so doing, is not only demonstrated by the evidence, but also in the very inception of this suit. What he greatly feared has come to pass: The control of the Times by the Blethen family is threatened by the action of an irresponsible son. Obviously, to hold that Clarance is a donee beneficiary under paragraph eight, would be to defeat one of Colonel Blethen's main objectives in his deal with Ridder Brothers. He wanted to get control of the Times into his own hands, but not at the cost of letting its control ultimately get away from his family.

The Ridder Brothers now say that, at the time the subject was under discussion, they insisted that the class B stock be left to Blethen's surviving sons, rather than to his wife, having the thought in mind that they might find one among them whose interest they could acquire and thus obtain control of the Times. Of the testimony to this effect, the trial court said:

"Now, under the testimony the motive or the primary purpose, taking Mr. Ridder's testimony, was not to confer a benefit upon the surviving sons of Blethen but primarily to strengthen the possible position of the Ridder Brothers

after the trust period, in that it gave to the Ridder Brothers the opportunity to deal with one of the sons for the benefit of the Ridder Brothers. . . .

"In the end, gentlemen, I dislike to do this but I believe we come just straight down to a question of veracity. Had the Ridder Brothers' position been merely that they had a hidden purpose, perhaps there might be a consistent line. If they had required Col. Blethen to make this agreement to divide his stock equally among the sons, the consideration would have been ample to enforce it. Now that Mr. Ridder says that he not only had this purpose but that he disclosed it and discussed it with Blethen, who had steadfastly refused all attempts at giving up control or letting it out of his family, the Court is unable to give the statement credit. I just don't believe it."

We have no reason to disagree with the trial court's appraisal of the testimony. None of the Ridders knew any of Blethen's sons. From the contracts and the evidence relating to the circumstances under which they were executed, we can find no basis for the claimed motive and purpose on their part to bestow a benefit or gift on Clarance, Jr.

In *Hutton v. Gonser,* 159 Wash. 219, 292 Pac. 743, *supra,* we were confronted with a situation which, in its legal aspects, is so closely analogous to that presented here as to be controlling of the controversy. In that case, a husband and wife executed a contract to make mutual wills, each leaving his or her property to the other; and covenanted that the survivor would leave his or her estate to his or her *own* collateral relatives. The wife died first. The husband made a will which breached the covenant. *His* relatives brought an action to enforce it. Denying their right to recovery, we said, p. 222:

"Manifestly the provision in each will in that respect in favor of the collateral kin of the testator was wholly voluntary, and without any consideration to support it except love and affection between the testator and his own collateral kin. There is an entire absence of evidence that any remainderman under either will ever performed any service or gave any valuable consideration to either testator, or that either testator was even acquainted with any remainderman under the other's will, other than a slight acquaintance of Mrs. Hutton with one of the remainder-

men under Mr. Hutton's will. The stipulation in his will of December 2, 1913, in favor of his collateral kin as remaindermen constituted neither consideration nor promise to her, nor was it for her benefit. They were not heirs of hers under the statutes of descent, nor natural objects of her bounty as those words are understood in the law of wills, and, as already noticed, with the exception of a slight acquaintance with one of them, they were all total strangers to her.

"Assuming, without deciding it to be true, as counsel for appellants contend, that, in the making of the wills of December 2, 1913, Mr. Hutton promised his wife that he would provide for his own separate kin as remaindermen, what of it? It was nothing to her, so far as this record shows. The remaindermen had done nothing in the way of valuable service or consideration on her behalf which made it justifiable on her part to undertake to exact a promise in their behalf, nor is there anything to show that that provision of his will was intended for any such purpose. It was a promise that did not bind him, he received nothing for it and was at liberty to wholly ignore it as he did in his later will."

We are convinced that, at the time the supplemental contract was executed, there was no intent or purpose in the mind of any of the parties to it to bestow a gift upon Clarance B. Blethen, Jr. He was merely an incidental beneficiary under its provisions. Therefore, this action cannot be maintained.

Judgment affirmed.

DRIVER, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.