[Civ. No. 29315. First Dist., Div. Two. May 22, 1972.]

DONALD WALTERS, Plaintiff and Appellant, v.
LOLA CALDERON, Individually and as Special Administratrix, etc.,
et al., Defendants and Respondents.

## Counsel

Charles M. Giovanetti for Plaintiff and Appellant.

Ryersen & Comstock and Harrison L. Comstock for Defendants and Respondents.

## Opinion

**TAYLOR, P. J.**—Donald Walters (hereafter Donald) appeals from an adverse judgment in his action to impose a constructive trust on the proceeds of a note and deed of trust assigned to respondent, Lola Calderon, by Donald's deceased adoptive father, William S. Walters[1] (hereafter dece-

---

[1]Lola Calderon was named individually in her capacity as special administratrix of the estate; the remaining respondent is her husband, Paul Calderon.

dent). Donald contends that: 1) as a donee beneficiary, he is entitled to quasi-specific performance of decedent's promise to convey the property to him in a 1942 agreement between the Tauzers and decedent; 2) his 1950 contract with decedent was valid, enforceable and supported by consideration; 3) Lola Calderon was not a bona fide purchaser and gave no adequate consideration for the assignment of the note and deed of trust; and 4) his remedies at law are inadequate. The case presents a question not previously decided in this state.

Viewing the record most strongly in favor of the judgment, the following facts appear. Donald, who was born in 1914, was the adopted son of William S. Walters who died on January 15, 1966, at the age of 84. About April 2, 1942, decedent and his first wife, Ruth, entered into an agreement with their attorney and friend, C. J. Tauzer, and his wife, Olive, which provided that: 1) the Tauzers were to pay off certain indebtednesses existing against some properties of decedent; 2) decedent would convey one-half interest in certain real and personal properties to the Tauzers; 3) the 4,370-acre Mountain Ranch owned by decedent would be conveyed one-half to the Tauzers, and operated jointly by decedent and the Tauzers, and all monies therefrom deposited in a joint account; decedent was to manage the ranch, and the Tauzers the business operations. Paragraph 6 of the agreement provided that "First parties [decedent and Ruth] are to execute a Will or Wills giving to their adopted daughter, Helen,[2] the 52-acre ranch on Russian River [hereafter referred to as the lower ranch]; and to their adopted son a 294 acre ranch[3] [hereafter referred to as the upper ranch], pursuant to certain trust provisions."

On September 11, 1949, after the death of his first wife, decedent married his second wife, Nell. Sometime before 1950 and concluding in the latter part of 1950, decedent and Olive Tauzer, the widow of C. J., settled all of their conflicting property rights arising out of the 1942 agreement.

After his marriage to his second wife, decedent discussed with his attorney, Henry Irwin, the possibility of creating a life estate for his second wife on the upper ranch and whether the 1942 agreement might cause any difficulties. Irwin advised decedent that in order to protect against any possible litigation with Donald, decedent should make an agreement with Donald, whereby Donald would waive the provisions of any other documents. On February 15, 1950, the parties executed an agreement pre-

---

[2]In October 1949, decedent's adopted daughter Helen filed a complaint against decedent and won a judgment decreeing that decedent owned a life estate and she a remainder interest in the lower ranch. This result was not based on the 1942 agreement but on a gift deed that had been prepared and delivered to the Tauzers.

[3]At the trial, the upper ranch was referred to as the "300 acre ranch."

pared by Irwin that provided, so far as pertinent: "(b) That for and in consideration of the mutual promises and agreements hereinafter contained, and for and in consideration of the love and affection each party hereto bears toward the other, the parties hereto agree as follows:

"1. DONALD WALTERS, the Second Party, hereby waives and relinquishes, revokes and releases any and all agreements and any and all provisions contained in any and all agreements heretofore made by WILLIAM S. WALTERS, First Party, with any person or persons wherein and whereby First Party agrees by his Will to devise and bequeath any property to Second Party.

"2. First Party agrees by his Last Will to devise and bequeath to Second Party the real property hereinafter described, subject to and reserving unto First Party the right by his Last Will to devise and bequeath a life estate to the wife of First Party living at the time of his death in and to the said real property, together with the rents, issues and profits therefrom to such wife during her lifetime.

"3. First Party, in his lifetime, may sell, lease and mortgage said property." At about the same time, Irwin prepared a will for decedent devising the upper ranch to Donald, subject to a life estate in favor of Nell.

Donald had no knowledge of the 1942 agreement until after his father's death, when he was advised of its existence. All that Donald knew about the 1950 agreement was that his father handed it to him and asked him to sign "to keep peace in the family."

Irwin represented decedent with respect to his divorce from Nell in 1956 or 1957. In the property settlement agreement executed on February 18, 1957, Nell relinquished all of her rights in the upper ranch.

Thereafter, pursuant to the provision in the 1950 agreement, Irwin represented decedent in a number of transactions, wherein decedent first sold 50.54 acres of the upper ranch to the Basalt Rock Company and on December 9, 1958, then sold 4.37 acres of the upper ranch to Joe Rochioli. Finally, on May 6, 1961, decedent sold the balance of the upper ranch to the Griffins, taking back the promissory note and deed of trust here in issue (hereafter the Griffin note).

On September 2, 1961, Irwin prepared another will for decedent, wherein decedent made specific cash bequests to various persons totaling $26,000, including a $5,000 bequest to Donald, and left the residue of his estate in trust for Donald's son. Irwin advised decedent that the will of September

1961 was inconsistent with the 1950 agreement with Donald and could lead to litigation.

The Calderons worked for decedent and lived on the upper ranch from 1956 until May 1961. On May 6, 1961, they moved with decedent to the lower ranch and there provided a home for him until his death on January 15, 1966. On various occasions, decedent sought and received advice from Irwin that decedent had the right to use the proceeds of the Griffin note as he saw fit. Decedent spent some of the proceeds of the note to repair and remodel the home on the upper ranch so that he and the Calderons could live there.

On May 7, 1962, decedent, after consulting another attorney, executed a will making cash bequests of $3,800 to various persons and the personal property on the lower ranch to the Calderons. The residue of the estate was left to respondent, Lola Calderon.

Sometime before June 24, 1965, decedent asked Lola to drive him to Santa Rosa to see an attorney. After driving around Santa Rosa for several hours, he spotted a sign indicating the law offices of Richard L. Cooper. After several meetings with decedent, during which Cooper talked alone with decedent and assured himself of decedent's competency, Cooper prepared the assignment of the Griffin note and deed of trust to Lola. At the time of the execution of this document, Lola paid decedent $10. The assignment provided that Lola, besides paying the amount of $10, was to "provide a home for and considerately care for W. S. Walters, including medical and burial expenses, for the remainder of W. S. Walters' life." From the date of the execution of this assignment, Lola collected all the payments on the Griffin note and deed of trust, advanced funds of her own to pay decedent's bills and continued to provide him with a home. As of January 15, 1966, the outstanding balance due on the Griffin note and deed of trust was in excess of $60,000. The verified petition for special letters of administration filed by Lola indicated that at the time of his death, decedent's estate consisted of about $5,000 of personal property.

The trial court found that decedent's June 24, 1965 assignment of the note and deed of trust to Lola Calderon was executed for valuable consideration, was not executed as the result of any undue influence, was executed at a time when decedent was of sound mind and understood the nature of his act and was his free and voluntary act. As to the agreement of February 1950 between decedent and Donald, the trial court found that under the terms of that agreement, decedent had the right during his lifetime to sell, lease and mortgage the property that he therein had agreed

to devise to Donald, and that during his lifetime decedent sold the property. The court further found that: the terms of the 1950 agreement were not just and reasonable; the agreement was not supported by adequate consideration; and Donald had adequate remedies at law to enforce the 1950 agreement. The trial court then concluded that: 1) Donald was not entitled to have a constructive trust imposed against the proceeds of the note in the hands of the Calderons; 2) the agreement of February 1950 was invalid and ineffective for any purpose; and 3) the assignment of June 24, 1965, was legally valid and effective, and entered judgment accordingly.

■ The first question on appeal is that of Donald's status under the 1942 agreement between his father and the Tauzers. Donald argues that as donee beneficiary of the 1942 agreement, he is entitled to equitable relief. The trial court, however, found that he had no legal right to enforce the agreement as he was not a donee of the promisee.

Civil Code section 1559 provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Although the statute does not set forth the various categories of beneficiaries, California has generally adopted the categories of the Restatement of Contracts, section 133, set forth, so far as pertinent, in the footnote below.[4] (*Southern Cal. Gas Co. v. ABC Construction Co.*, 204 Cal.App.2d 747 [22 Cal.Rptr. 540].)

■ The question of whether a third party is a donee, creditor or incidental beneficiary is a question of construction and the intent must be gathered from reading the contract as a whole under the light of the circumstances under which it was entered (*Ralph C. Sutro Co. v. Paramount Plastering, Inc.*, 216 Cal.App.2d 433 [31 Cal.Rptr. 174]). The test is whether an intent to benefit the third party appears from the terms of the contract (*Le Ballister v. Redwood Theatres, Inc.*, 1 Cal.App.2d 447, 449 [36 P.2d 827]).

Here, there is no question that Donald was the adopted son referred to in paragraph 6 of the 1942 agreement. ■ However, it is not every

---

[4]"(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;

"(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary . . .

"(c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist."

contract for the benefit of a third person that is enforceable by the beneficiary. The fact that he is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment. It must appear to have been the intention of *the parties* to secure to him personally the benefit of its provisions.

■ In the instant case, a cursory reading of the 1942 agreement indicates the intent of decedent's promise to devise the upper ranch to Donald. But the crucial factor is the intent of *the promisee* to confer a benefit on the third party, as in a normal situation, the promisor is interested only in obtaining whatever consideration the promisee will provide for entering into the contract rather than in benefiting a third party. Normally, it is the promisee who is the one who must intend to benefit the third party (4 Corbin on Contracts, § 776, p. 18). Under the 1942 agreement, decedent is the *promisor* and the Tauzers the *promisees* of the promise to devise the ranch in question to Donald. Thus, if Donald obtained valid, enforceable third party beneficiary rights under the 1943 agreement, it must be established that there was also an intent by the Tauzers to confer a benefit on him.

While our research has disclosed no California case precisely in point, the leading case is *Ridder* v. *Blethen* (1946) 24 Wn.2d 552 [166 P.2d 834], which is on all fours with the instant case. In that case, Blethen, Sr., made a general overall business agreement with three brothers named Ridder for the organization of a corporation to publish the Seattle Times, then controlled by Blethen, Sr. The contract included a provision that Blethen, Sr., would make a last will and testament leaving his Class B stock in the corporation in trust for 21 years and on termination of the trust, the remainder to Blethen's four sons, equally. Subsequently, Blethen, Sr., made a will disinheriting one of his four sons and died. Clarence, Jr., the disinherited son, thereafter sued on the above contract, alleging that he had acquired an enforceable third party donee beneficiary right. The court, however, held that Clarence had no rights under the contract between his father and the Ridders and cited section 133 of the Restatement of Contracts for authority that the test in determining whether a party is a donee beneficiary is whether *the promisee* had an intent to make a gift to the purported donee beneficiary.

After reviewing all of the pertinent evidence, the court concluded that the principal purpose of the provision was to provide for management and control of the corporation by the Blethen family. The court particularly noted at page 838 that none of the Ridders knew any of the Blethen sons;

thus, there was no basis for any motive and purpose on their part to bestow a gift on Clarence. The court in *Ridder* also cited *Hutton* v. *Gonser* (1930) 159 Wash. 219 [292 P. 743], wherein a husband and wife made mutual and reciprocal wills. The wife died first and the husband then made a new will disinheriting some of his own collateral heirs who then sued in attempting to enforce the agreement. In denying the plaintiffs' right to recovery, the court noted at page 744 that under the contract in question, it would be unreasonable to assume any intent on the part of the wife to confer donee beneficiary rights upon her husband's collateral heirs.

Also in accord is the ruling in *In re Conay's Estate* (1953) 29 Misc.2d 1090 [121 N.Y.S.2d 481], adhered to on rehearing, 29 Misc.2d 1095 [125 N.Y.S.2d 62], and affirmed 284 App. Div. 950 [135 N.Y.S.2d 626]. In that case, two brothers, Louis and Max, partners in business, entered into an agreement, whereby each agreed to bequeath 50 percent of his interest in the business to the other, and the rest of his interest in the business to "other persons." Thereafter, each brother executed a will in accordance with the terms of their agreement. Max died and Louis inherited Max's entire interest in the business on condition that Louis pay the debts of the company and a sum to Max's widow. Louis did so. Several years later, Louis married and thereafter executed a new will that made no provision whatsoever for the persons named in the agreement with Max as legatees of his interest in the business. The legatees then sued on the theory that they were third party donee benficiaries of the original agreement between the brothers. In denying recovery, the court held at page 483 that a person not a party to the contract *"acquires the status of donee beneficiary, and is therefore entitled to enforcement of the contract, if and only if* the promise is particularly *exacted by the promisee for the benefit of such third person"* (italics supplied). The court relied on section 133 of the Restatement of Contracts and an earlier New York case, *Vrooman* v. *Turner,* 69 N.Y. 280, that held: "To give a third party, who may derive a benefit from the performance of the promise, an action, there must be, first, an intent by the promisee, to secure some benefit to the third party, . . ."

Similarly here, as in *Conay, supra,* the evidence surrounding the execution of the 1942 agreement between decedent and the Tauzers indicated that the primary purpose of the agreement was the adjustment of their business affairs. As in *Ridder,* the Tauzers had no obligation of any kind to Donald. It follows that here, the trial court properly concluded that although Donald was expressly referred to in the 1942 agreement, he was merely an incidental beneficiary of that agreement. We note that Donald's sister in a prior litigation acquired her residuary interest in the lower ranch

mentioned in the 1942 agreement not by virtue of that agreement but because decedent had delivered a deed to her to the Tauzers.

Donald here, relying on *Smith* v. *Anglo-California Trust Co.,* 205 Cal. 496, 502 [271 P. 898], and *Fruitvale Canning Co.* v. *Cotton,* 115 Cal. App.2d 622, 625 [252 P.2d 953], argues that to permit a third person to bring an action on a contract, there must be "an intent clearly manifested by the promisor" to secure some benefit to a third person. However, in *Lucas* v. *Hamm,* 56 Cal.2d 583, at page 591 [15 Cal.Rptr. 821, 364 P.2d 685], our Supreme Court said with reference to the *Smith* and *Fruitvale* cases: "This language, which was not necessary to the decision in either of the cases, is unfortunate. Insofar as intent to benefit a third person is important in determining his right to bring an action under a contract, it is sufficient that the promisor must have understood that the promisee had such intent. (Cf. Rest., Contracts, § 133, subds. 1(a) and 1(b); 4 Corbin on Contracts (1951) pp. 16-18; 2 Williston on Contracts (3d ed. 1959) pp. 836-839.) No specific manifestation by the promisor of an intent to benefit the third person is required. The language relied on by defendant is disapproved to the extent that it is inconsistent with these views." Here, as we have indicated above, there was no evidence indicating that the Tauzers had any intent to benefit Donald or that decedent understood that they had any such intent.

■ We turn next to the 1950 agreement between Donald and decedent. Donald contends that the agreement was supported by adequate and valid consideration. As indicated above, the agreement recited that the mutual promises of the parties were made in consideration of the love and affection that each party bears toward the other and also upon Donald's waiver. ■ As to love and affection, it is well settled in this state that while love and affection may constitute a sufficient consideration to uphold an agreement against creditors and subsequent purchasers, it does not constitute the valuable consideration necessary to support the validity of a contractual promise (*Hanscome-James-Winship* v. *Ainger,* 71 Cal.App. 735 [236 P. 325]; *Ehret* v. *Ichioka,* 247 Cal.App.2d 637, 643 [55 Cal. Rptr. 869]; 1 Corbin on Contracts, § 131).

■ We turn next to the more complex question of whether, by the 1950 agreement, Donald relinquished any rights that he had under the 1942 agreement. Although we have concluded that Donald as an incidental beneficiary did not acquire any enforceable rights under the 1942 agreement, this is not necessarily determinative. ■ The rule is that relinquishment or forbearance of a claimed right is good consideration for the creation of a new right, regardless of whether the claimed right actually

was effective or not (*Fuller* v. *Towne,* 184 Cal. 89 [193 P. 88]). The determinative question is whether the purported right waived or relinquished was one that the promisee could have urged in good faith and which presented some bona fide question of validity, however slight, rather than whether the right was actually legally valid and effective (cf. *Cuenin* v. *Lakin,* 146 Cal.App.2d 855, 858 [304 P.2d 157]).

It is clear, however, that where the right allegedly waived and relinquished was obviously worthless and ineffective, a promise to relinquish it would not constitute a valid consideration. *City Street Improvement Co.* v. *Pearson,* 181 Cal. 640 [185 P. 962, 20 A.L.R. 1317], so held where a promissory note was given in consideration of forbearance to foreclose a lien on a street assessment that both parties believed was valid. The assessment was void for technical reasons that were ascertainable from the public record. Also in accord are *Goldner* v. *Jaffe,* 171 Cal.App.2d 751 [341 P.2d 354], *Doria* v. *International Union,* 196 Cal.App.2d 22 [16 Cal.Rptr. 429], and *Union Collection Co.* v. *Buckman,* 150 Cal. 159, 164 [88 P. 708].

 In the instant case, as indicated above, Donald testified that he had no knowledge of the existence of the 1942 agreement. The first time he ever saw the copy of the original of the 1942 agreement was on June 21, 1968, at a time when his deposition was being taken in the instant matter. He did not even know of the existence of the 1942 agreement until he was told about it after decedent's death.[5]

Donald also testified that at the time of the execution of the 1950 agreement, there was no discussion of consideration. All that occurred was that decedent brought the document to Donald and told him to sign "to keep peace in the family." Donald had no other discussion with decedent at that time and did not discuss it with Irwin until later. Even then, the only discussion with Irwin consisted of Irwin's statement that he was glad Donald had signed the document to keep peace in the family.[6] Therefore, it appears that the purported right that Donald waived on entering into the 1950 agreement was not one that he could have advanced in good faith since he did not even know of the existence of the 1942 agreement at the time he executed the 1950 agreement.

---

[5]Donald did testify that at one time his mother had told him that he would inherit the upper ranch from decedent. There was, however, no indication in the record of any relationship between decedent and Donald's mother or any connection between this statement and the provision in the 1942 agreement.

[6]Obviously, the trial court, as it was entitled to do, disbelieved Irwin's testimony that prior to the signing of the 1950 agreement, Donald had been informed of the 1942 agreement.

Even if we were to conclude that Donald's waiver of the unknown right would constitute technical legal consideration, there is the further question of whether the consideration is adequate to warrant the equitable relief requested. As indicated above, Donald sought to impose a constructive trust on the proceeds of the note from the sale of the upper ranch that decedent had allegedly promised to devise to Donald in the 1942 agreement. The remedy of constructive trust in this context is usually referred to as "quasi-specific performance" as it is not true specific performance of the original agreement to make a will. Accordingly, the classic requirements for specific performance must be met before the plaintiff is entitled to his remedy by way of constructive trust. It is a well settled equitable principle that specific performance of a contract cannot be granted unless the consideration is fully adequate and equitable. Civil Code section 3391 provides that specific performance cannot be enforced against the party to a contract "If he has not received an adequate consideration for the contract." ■ Where quasi-specific performance of a contract to make a will is sought, the existence of consideration is not sufficient. In addition, the consideration must also be equitably adequate (54 Cal.Jur.2d, Wills, § 532). (*Notten* v. *Mensing,* 20 Cal.App.2d 694 [67 P.2d 734]; *Baumann* v. *Kusian,* 164 Cal. 582 [129 P. 986].)

*Baumann* is particularly pertinent as there, a husband and wife promised to their two adopted children at the time the children were taken from the orphanage that if the children remained at home as part of the family, they would receive all of the property. The children stayed home until their respective marriages. Thereafter, the husband and wife died leaving wills making different dispositions of their property. When the children attempted to sue for specific performance by way of a constructive trust, the court held that they were not entitled to the equitable remedy as the consideration they had given was not sufficiently adequate in a court of equity. The court noted that they gave up and sacrificed nothing of value.

■ The third clause of the 1950 agreement giving decedent all rights to mortgage and dispose of the upper ranch is completely inconsistent with the retention of any interest by Donald. Furthermore, decedent, before his death, totally divested himself of the upper ranch and thereby, by his conduct, revoked his promise to devise the property to Donald as he was entitled to do. Contracts to bequeath or devise property because of their ambulatory nature, are distinct from ordinary third party agreements (see 58 Va.L.Rev. 41).

Donald also argues that he is entitled to equitable relief as his remedy at law to enforce the 1950 agreement is clearly inadequate since the estate

of decedent, as indicated by the special letters filed, had assets of $5,000. We will not discuss this question as we have here concluded that Donald had no enforceable rights under the 1950 agreement.

■ Finally, Donald contends that the trial court erred in concluding that the 1965 assignment from decedent was supported by valuable consideration. Donald first argues that Mrs. Calderon was not a bona fide purchaser. ■ A bona fide purchaser is one who has purchased property for value without notice of any defects in the title of the seller. ■ As Donald does not contend that Mrs. Calderon had any knowledge of any possible defects, his contention is confined to the question of value. ■ In dealing with the question of testing the status of a person as a bona fide purchaser, the question is one of legal consideration necessary to sustain an action for damages rather than the amount of consideration required in an equitable action for specific performance. As noted in *Estate of Freeman,* 238 Cal.App.2d 486, 488-489 [48 Cal.Rptr. 1], ordinarily, a court will not weigh the sufficiency of the consideration once it is found to be of some value. "Generally, some value means any value whatsoever, even that of a peppercorn, a tomtit,[7] or *one dollar* in hand" (italics added). ■ In the instant case, the uncontroverted evidence indicates that decedent had independent advice concerning the making of the assignment. The assignment also specifically provided that Mrs. Calderon was to pay him $10 at the time of execution and was thereafter to provide a home and care for decedent, including medical and burial expenses, for the remainder of his life. The evidence also indicates that for several years prior to the 1965 agreement, decedent had lived with and been provided a home by Mrs. Calderon and her husband. Accordingly, the trial court properly concluded that the agreement, the 1965 assignment, was supported by adequate consideration and was enforceable.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

---

[7]Defined by Webster's as a titmouse, e.g., a wren.