**HEALY TIBBITTS CONSTRUCTION COMPANY, a corporation, Plaintiff,**

v.

**FOREMOST INSURANCE COMPANY, a corporation, Defendant.**

No. C78–1897 SAW.

United States District Court, N. D. California.

May 31, 1979.

John E. Droeger, Hall, Henry, Oliver & McReavy, San Francisco, Cal., for plaintiff.

Alf R. Brandin, Lillick, McHose & Charles, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

WEIGEL, District Judge.

On August 21, 1978, plaintiff Healy Tibbitts Construction Company (hereafter "HTC") filed this action for declaratory relief against Foremost Insurance Company (hereafter "FIC"). HTC seeks a declaration that under a certain protection and indemnity insurance policy No. 741273 (hereafter "policy") FIC was and is under a duty to defend HTC in another case pending in this court, *United States v. Claus von Wendel,* No. C77–1698 SW, and to indemnify HTC in the event that HTC is held liable to the United States in said action. The court has concluded that the declaration sought by HTC should be denied.

HTC, with headquarters in San Francisco, is a building and construction company which maintains and uses floating equipment. FIC is an insurance company with headquarters in Michigan. Jurisdiction is established under 28 U.S.C. § 1332.

Carl Hoag was HTC's insurance broker at all times relevant to this litigation. On November 19, 1974, he procured from James E. Moore & Co. the policy naming FIC as the insurer and HTC as the assured. The policy extended coverage to several vessels owned by HTC, including a crane barge known as the HT–4. The parties have stipulated that the policy was valid and in effect at all relevant times. The policy provides, in pertinent part:

> "The Assurer hereby undertakes to make good to the Assured . . . all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:

> \*   \*   \*   \*   \*   \*

> (6) Liability for damage to any . . property whatsoever, except another vessel or craft, . . .

> (7) Liability for cost or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law, provided, however, that:

>> (a) There shall be deducted from such claim for cost or expenses, the value of any salvage from . . . the wreck, inuring, or which might have inured, the benefit of the Assured.

> \*   \*   \*   \*   \*   \*

> (14) Costs, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, subject to the agreed deductibles applicable, and subject further to the conditions and limitations hereinafter provided.

## GENERAL CONDITIONS AND/OR LIMITATIONS

Warranted that in the event of any occurrence which may result in loss, damage and/or expense for which this Assurer is or may become liable, the Assured will use due diligence to give prompt notice thereof and forward to the Assurer as soon as practicable after receipt thereof, all communications, processes, pleadings and other legal papers or documents relating to such occurrences.

\*      \*      \*      \*      \*      \*

Whenever required by the Assurer the Assured shall aid in securing information and evidence and in obtaining witnesses and shall cooperate with the Assurer in the defense of any claim or suit  .   .   . in respect of any occurrence as hereinbefore provided.

The Assured shall not be liable for the cost or expense of  .   .   . defending any claim or suit unless the same shall have been incurred with the written consent of the Assurer, or the Assurer shall be satisfied that such approval could not have been obtained under the circumstances without unreasonable delay, or that such costs and charges were reasonably and properly incurred, such cost or expense being subject to the deductible.

\*      \*      \*      \*      \*      \*

The Assurer shall be liable for the excess where the amount deductible under this policy is exceeded by (A) the cost of investigating and/or successfully defending any claim or suit against the Assured based on a liability or an alleged liability of the Assured covered by this insurance, or (B) the amount paid by the Assured either under a judgment or an agreed settlement based on the liability covered herein including all costs, expenses of defense and taxable disbursements.

\*      \*      \*      \*      \*      \*

## PROTECTION & INDEMNITY POLLUTION EXCLUSION CLAUSE

NOTWITHSTANDING anything to the contrary contained in this Policy, no liability attaches to the Assurers for any loss, damage, cost, liability, expense, fine or penalty, of any kind or nature whatsoever, whether statutory or otherwise, imposed upon the Assured arising directly or indirectly in consequence of the actual or potential discharge, spillage or leakage of oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or description."

HTC chartered the HT–4 to Claus von Wendel on a hire purchase basis. On October 15, 1975, while being operated by von Wendel to remove piling and debris at the U.S. Naval Supply Center, Oakland, pursuant to a contract between von Wendel and the Navy, the barge began listing as water entered through a hole in the hull. von Wendel and his crew moved the HT–4 into shallow water, where it came to rest, partially submerged, still within the area of the Naval Supply Center. As the barge submerged, oil escaped into the water through an open vent in the fuel tank which supplied the boiler for the barge's steam crane. FIC agrees, as it must, that the sinking of the HT–4 was the proximate cause of the escape of oil. There was no evidence to suggest that the leakage would have occurred but for the sinking of the HT–4.

The Navy began the cleanup of the oil on the afternoon of the sinking. The cleanup operation took several days. Five days after the sinking, on October 20, 1975, Hoag sent a letter to James E. Moore & Co., reporting the sinking of the HT–4 and suggesting the possibility that some liability might be imputed to HTC, as owner of the barge.

The Navy sought removal of the submerged HT–4 from the Naval Supply Center. On January 29, 1976 Colonel Flertzheim, of the San Francisco District Corps of Engineers, wrote to HTC stating that if it did not provide a written guarantee of a plan for removal of the HT–4 proposed by von Wendel, "the Corps of Engineers will prosecute the removal of the vessel and will attempt to recover costs of such operation from any and all responsible parties." In response, HTC gave the requested guaran-

tee. On March 25, 1976, von Wendel refloated the barge and received title to it pursuant to an agreement with HTC.

In May, 1976, HTC received notice of a Coast Guard hearing to be held concerning the HT–4. HTC was informed that all interested parties parties must be notified and given an opportunity to be heard. Jarvis Gates, Vice President of HTC, asked in his letter of reply: "have you notified the U.S. Navy Supply Center in Oakland, Mr. Claus von Wendel, and First International Assurance, Ltd.?" FIC was not mentioned as a party to be notified. The outcome of the HT–4 hearing was the assessment of a $1500.00 fine on HTC.

On August 4, 1977, the United States brought the aforementioned action (*United States v. Claus von Wendel*, No. C77–1698 SW) against Claus von Wendel, HTC, HT–4, Unnamed House and Equipment Barge and Unnamed Floating Drydock Located at Naval Supply Center, Oakland, California. The three causes of action in said suit naming HTC as a defendant, charged that HTC and von Wendel were liable for the $55,028.44 cost of removing from the water the oil which escaped from the HT–4.

In the early part of 1978, HTC and FIC engaged in correspondence concerning the United States suit. In a letter of March 15, 1978, John Hysong, liability claims supervisor for FIC, informed John E. Droeger, counsel for HTC, that FIC believed that the insurance policy did not cover the costs of cleaning up the oil and that FIC would not indemnify HTC for any judgment resulting from the portion of the United States suit dealing with that matter. Hysong added that FIC was prepared to consider whether the wreck removal clause § (7) of the policy was applicable, and asked for further documentation. Droeger replied by letter one week later, stating *inter alia:* that the matter on which HTC was sued by the United States "arises from a peril *clearly covered* by the policy"; that HTC would accept a defense under a reservation of rights; that an insurer who refuses to defend does so at very great peril; and that the Pollution Exclusion Clause "does not purport to apply to the duty to defend." On March 29, 1978, Hysong wrote to tell HTC that FIC had forwarded a copy of HTC's claim file to the law firm of Lillick McHose & Charles (hereafter "Lillick") and that FIC had asked said firm to "look after the defense of the lawsuit brought against you by the United States." On the same day, Hysong wrote the law firm requesting that it "enter an appearance and answer on behalf of" HTC in the suit brought by the United States. Both of the letters noted that FIC was acting under a reservation of rights.

Upon receipt of Hysong's March 29th letter, HTC instructed Droeger to provide Lillick with a substitution of attorneys and HTC's files in No. C77–1698 SW. On April 3rd, Droeger wrote to Hoag that Droeger's law firm would look to Hoag's firm for indemnity in the event that FIC denied coverage, and was held to have properly denied it and/or refused to pay for legal services performed so far. On April 4th, Droeger contacted Alf R. Brandin of Lillick to arrange for the delivery of HTC's files and for a substitution of attorneys. Brandin informed Droeger that Lillick had not be retained by FIC to defend HTC in No. C77–1698 SW; instead Lillick had been asked to determine whether FIC might be responsible for indemnifying HTC pursuant to the wreck removal clause of the policy. On April 7, 1978, Hysong wrote to Droeger that FIC would not defend HTC in No. C77–1698 SW for the following reasons: the wreck removal clause was not applicable to the United States claim against HTC; the policy imposed no duty to defend on the insurer; and the Pollution Exclusion Clause of the policy excluded coverage for any costs arising from the escape of oil from the HT–4.

Before reaching the merits of HTC's claim for defense and indemnity under the terms of the policy, the Court must consider FIC's contention that HTC is estopped from asserting said claim. This contention is based on HTC's alleged failure to notify FIC of a possible oil pollution claim until twenty-seven months after the sinking of the HT–4, and nearly six months after the

filing of suit by the United States in No. C77–1698 SW. FIC argues that it was prejudiced by the lack of timely notice as required by the policy. For example, FIC avers that it could not properly inform itself concerning the circumstances of the escape of oil from the HT–4 since the oil had been cleaned up and the HT–4 had been removed from the Naval Supply Center and repaired by the time that FIC was informed of the oil escape. In addition, FIC argues that it was denied the opportunity to make decisions concerning the cleanup of the oil which might have cancelled or greatly reduced its potential liability.

■ The policy is one of marine insurance. *See International Sea Food Ltd. v. M/V Campeche*, 566 F.2d 482, 485 (5th Cir. 1978). Its interpretation should therefore be governed by federal admiralty law, provided that there is a well-settled applicable federal rule. *Wilburn Boat Co. v. Fireman's Ins. Co.*, 348 U.S. 310, 316, 75 S.Ct. 368, 99 L.Ed. 337 (1955). In this case, however, neither of the parties has suggested, and this Court has not found, any established federal rule dealing with the policy's notice provision and with FIC's estoppel claim. Accordingly, *Wilburn Boat Co.* requires that state law be applied. Federal choice of law rules determine what state law to apply. Those rules require the application of the law of the state with the most significant nexus with the insurance contract. *Ahmed v. American S. S. Owners Mutual Protection and Indemnity Assoc., Inc.*, 444 F.Supp. 569, 571 (N.D.Cal.1978). The parties do not dispute that California law should govern in the circumstances of this case. The policy was negotiated and signed in California. HTC's principal place of business and the place of operation of the HT–4 are also in that state. Finally, most of the events, which provide a basis for this suit, took place in California.

■ Under California law, mere delay by an insured in notifying an insurer of a claim does not create a presumption of prejudice to the insurer nor constitute a defense to liability under the policy, even when the policy requires notice "as soon as practicable," as it does here. *See Northwestern Title Security Co. v. Flack*, 6 Cal.App.3d 134, 141, 85 Cal.Rptr. 693 (1970). On the contrary "it is clear that the burden is on the insurer to prove that it suffered substantial prejudice as the result of the insured's breach." *Colonial Gas Energy System v. Unigard Mut. Ins. Co.*, 441 F.Supp. 765, 768–69 (N.D.Cal.1977). *See also Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 577 n. 8, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973).

■ Measured against this standard, FIC's claim of estoppel is not meritorious. First, the evidence shows that on October 25, 1975, five days after the sinking of the HT–4, Hoag mailed notice to Moore & Co. FIC does not deny this. Rather, FIC argues that HTC should have notified FIC directly, implying that Moore & Co was not authorized to receive notice on FIC's behalf. But Hoag testified that the only normal method of giving casualty notice is to notify the "surplus line broker," which was Moore & Co. FIC has offered no evidence to the contrary nor to impeach Hoag's credibility. To be sure, HTC did not mention FIC when the Coast Guard asked who should be notified of the Coast Guard hearing concerning the HT–4 sinking. But FIC has not shown that it was prejudiced by this omission. HTC is not asking here for contribution to the fine which was assessed against it at the hearing.

Second, even if the October 20, 1975, notice to Moore & Co. was insufficient to put FIC on constructive notice of the HT–4 accident, FIC's estoppel claim would still fail. FIC has not met its burden of showing that it suffered "substantial prejudice." Indeed FIC has offered no evidence of prejudice at all. As previously noted, FIC stipulated that the oil spill resulted proximately from the sinking of the HT–4. It follows that FIC cannot claim that access to the wrecked HT–4 immediately after the accident was necessary to determine the cause of the spill and the applicability of FIC's Pollution Exclusion Clause policy defense to this action. Similarly, FIC's stipulation that the Navy cleanup began on the after-

noon of the day of the accident rules out any argument that FIC could have minimized its exposure under the policy by cleaning up the oil more efficiently than the Navy. There has been no showing that there was any opportunity for FIC even to attempt to do so.

■ Turning to HTC's claim for indemnity under the policy, the initial burden is on it to establish that the loss resulting from the oil spill, namely, the cost of the cleanup, arose from a covered peril. *See Northwestern Mutual Life Ins. Co. v. Linard*, 498 F.2d 556, 561 (2d Cir. 1974). HTC has met this requirement by showing that Section 6 of the policy broadly protects it against loss based on damage to "any . . property whatsoever." Accordingly, the burden shifts to FIC to prove by a preponderance of the evidence that the cause of the loss falls within a policy exclusion. *See Strubble v. United Services Auto Assoc.*, 35 Cal.App.3d 498, 110 Cal.Rptr. 828 (1973); *Milliken v. Fidelity & Cas. Co.*, 338 F.2d 35, 41 (10th Cir. 1964). The Court must consider any claim of exclusion within the ambit of the general principle of marine insurance law that where the language of an insurance policy may reasonably be construed in more than one way, the meaning most beneficial to the insured is to be given effect. *Allen Spooner & Son, Inc. v. The Connecticut Fire Ins. Co.*, 314 F.2d 753, 755 (2d Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963). *See also State Farm Mut. Auto Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973) (policies are to be broadly construed as to coverage and narrowly construed as to exclusions).

■ FIC maintains that it has met its burden because the Pollution Exclusion Clause eliminates its liability for any losses resulting from the spilling of oil. This contention is well-taken. HTC argues in rebuttal that FIC is liable, notwithstanding the Pollution Exclusion Clause, under the following insurance law principles: (1) an insured is entitled to coverage if a peril which was insured against causes the action of an excepted peril, which in turn causes the loss, *Sabella v. Wisler*, 59 Cal.2d 21, 30–35, 27 Cal.Rptr. 689, 377 P.2d 889 (1963); *Gillis v. Sun Ins. Office, Ltd.*, 238 Cal. App.2d 408, 415–24, 47 Cal.Rptr. 868 (1965); and (2) where two perils cause a loss, one being insured against and the other excepted, the insured is entitled to coverage. *State Farm Mut. Auto Ins. Co. v. Partridge*, 10 Cal.3d 94, 104–05, 109 Cal.Rptr. 811, 514 P.2d 123 (1973). *But see Wootton Hotel Corp. v. Northern Assur. Co. Ltd.*, 57 F.Supp. 112, 113 (E.D.Pa.1944), *aff'd*, 155 F.2d 988 (3d Cir.), *cert. denied*, 329 U.S. 758, 67 S.Ct. 111, 91 L.Ed. 654 (1946). HTC urges that these principles are applicable because the sinking of the HT–4 was a peril which the policy insured against, even though oil pollution was an excepted peril.

HTC's argument is in error because Section 6 of the policy does not insure against the *peril* of sinking. Instead, Section 6 insures against *liability* for loss based on damage to certain property which may result from perils such as sinking.[1] The principles relating to perils are therefore inapplicable here. There was no insured peril acting concurrently with or causing the excepted peril of oil pollution. Indeed, the argument that those principles should be applied to a section of a policy which does not insure against specific perils proves too much. If such an argument were accepted—given the fact that oil can never escape from a barge without the intervention of some other factor—HTC could claim that Section 6 makes FIC liable whenever there

---

1. In contrast, the insurance policies in the cases relied on by HTC all insured against specific perils. *See, e. g., Sabella v. Wisler, supra*, 59 Cal.2d at 26, 27 Cal.Rptr. at 691, 377 P.2d at 891 ("all risks of physical loss except as hereinafter excluded"); *Gillis v. Sun Ins. Office, Ltd., supra*, 238 Cal.App.2d at 415, 47 Cal.Rptr. 868 (direct "loss by windstorm"); *State Farm Mut. Auto Ins. Co. v. Partridge, supra*, 10 Cal.3d at 99 n. 5, 109 Cal.Rptr. at 814, 514 P.2d at 126 (damages caused by "an accident, including injurious exposure to conditions"). *See also New Zealand Ins. Co. v. Lenoff*, 315 F.2d 95, 96 (9th Cir. 1963) (similar to *Sabella* ). *See generally Denham v. La Salle Madison Hotel Co.*, 169 F.2d 576, 579–83 (7th Cir.), *cert. denied*, 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948).

is an oil spill. In such circumstances, HTC could always contend that the intervening factor is a "covered" peril which "caused" the excepted peril of oil pollution. This would be tantamount to reading the Pollution Exclusion Clause out of the policy altogether.

HTC also seeks indemnity for the cost of the cleanup of oil under Section 7 of the policy, the wreck removal clause. This claim appears to rest on the view that the oil spill itself was part of the "wreck," within the meaning of Section 7. Even if this tenuous interpretation were correct, HTC's claim under Section 7 must fail for the reasons discussed earlier with respect to its claim under Section 6. *See also Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 504 (2d Cir. 1972).

HTC claims that the insurance policy imposes upon FIC a duty to defend HTC in No. C77–1698 SW, or to pay the costs of said defense, even if HTC is not entitled to indemnity under the policy. The cases do hold that where an insurance policy includes the duty to defend, the carrier must defend any suit which potentially seeks damages within the coverage of the policy. *First Ins. Co. of Hawaii v. Continental Cas. Co.*, 466 F.2d 807, 810 (9th Cir. 1972); *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275–76, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). Moreover, since modern procedural rules focus on the facts of a case rather than on the theory of recovery stated in the complaint, the defense obligation must be determined in the context of the factual background of the case against the insured, and not merely in the light of the language of the complaint. *Journal Pub. Co. v. General Cas. Co.*, 210 F.2d 202, 209 (9th Cir. 1954); *Paramount Props. Co. v. Transam. Title Cas. Co.*, 1 Cal.3d 562, 571, 83 Cal.Rptr. 394, 463 P.2d 746 (1970). In addition, where an exclusionary clause excuses an insurer's liability under a policy imposing the duty to defend, that duty is not necessarily vitiated. Rather, unless the clause clearly extends to the duty to defend, the existence of such a duty is tested according to the insured's reasonable expectation of coverage. *Gray*

*v. Zurich Ins. Co., supra*, 65 Cal.2d at 273–75, 54 Cal.Rptr. 104, 419 P.2d 168.

However, the policy in suit does not *obligate* the insurer to undertake the defense of an action brought against the insured. It confers the *right* upon the insurer to take over a lawsuit. But this right is for the benefit of the insurer. It cannot be said to create a duty to defend. *Kienle v. Flack*, 416 F.2d 693, 696 (9th Cir. 1969). The policy does obligate the insurer to pay the reasonable costs incurred "in defense against any liabilities insured against hereunder." But, as has been noted, *supra* the action by the United States against HTC does not seek damages within the coverage of the policy. *Cf. Denham v. La Salle Madison Hotel Co.*, 168 F.2d 576, 584 (7th Cir.), *cert. denied*, 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948). On the contrary, the Pollution Exclusion Clause excludes such coverage. That Clause clearly extends to the costs of defense and to the duty to defend, if any.

In the alternative, HTC argues that the March 29, 1978, letter from Hysong to Droeger constituted a clear and unequivocal offer to defend HTC under a reservation of "our right to deny coverage to you." HTC contends that its prompt acceptance of the offer created a contract, to which FIC is bound to adhere. This argument also falls short. Even if the March 29, 1978, letter constituted an offer and HTC accepted the offer, HTC has failed to show that there was adequate consideration for FIC's alleged obligation to defend HTC.

HTC contends that the consideration consists in the policy premium and in HTC's acceptance of a defense under a reservation of rights. HTC claims that it was entitled under the policy to insist on a defense without such a reservation. But the premium paid by HTC to FIC was consideration for the policy itself. It was not consideration for any separate promise or offer by FIC. Moreover, HTC had no right to a defense free of any reservation of rights by FIC. Even where an insurer has expressly contracted to defend an insured, which is

more than FIC did here, the insurer may defend, under a reservation of rights, a suit brought against the insured. *See, e. g., Val's Painting & Drywall Inc. v. Allstate Ins. Co.*, 53 Cal.App.3d 576, 585, 126 Cal. Rptr. 267 (1975). It follows that HTC's relinquishment of that purported right was not adequate consideration for FIC's alleged promise to defend HTC. *See Walters v. Calderon*, 25 Cal.App.3d 863, 873–74, 102 Cal.Rptr. 89 (1972).

In the light of the foregoing findings of fact and conclusions of law,

IT IS HEREBY ORDERED AND ADJUDGED that HTC take nothing, that the action be dismissed on the merits, and that FIC recover of HTC its costs of the action.